THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH PACE, Defendant-Appellant.

Second District   No. 2—90—0626

Opinion filed February 21, 1992.

George Patrick Lynch, Ltd., and M. Jacqueline Walther, of Kielian & Walther, both of Chicago (George P. Lynch, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Joseph Pace, appeals his conviction after a jury trial for first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2). Concurrent sentences of natural-life imprisonment for first-degree murder and 30 years' imprisonment for armed robbery were imposed. On appeal, defendant raises 10 issues. For the reasons expressed below, we reverse and remand for a new trial.

The 10 issues on appeal are whether: (1) the trial court erred in denying defendant's motion for automatic substitution of judges; (2) the trial court erred in refusing to give a tendered instruction on accomplice testimony; (3) reversible error occurred when photographs of decedent and containers of human blood were sent back to the jury; (4) defendant's statements to police should have been suppressed because the police failed to allow defendant's mother into the interview room; (5) statements of a coconspirator should have been excluded as hearsay; (6) evidence that defendant was accused of prior thefts from the theater was improperly admitted; (7) prejudicial error resulted from admitting into evidence knives found in defendant's car; (8) a venireman's comments that he could not be impartial were prejudicial; (9) the prosecutor's rebuttal argument was improper; and (10) the sentence imposed was excessive.

Defendant's convictions stem from his participation in the murder of Ronald Roberts. Roberts was a manager at the Cineplex Odeon Theater in the Fox Valley Mall in Aurora, Illinois. On December 23, 1988, defendant, Thomas Olds and Steven Schoppe met at the Musicland store in Joliet, Schoppe's place of employment, to discuss their plans for that evening. Defendant, 16 years old at the time of the incident, suggested that they go to the movies because they could get in for free. Defendant had been employed at the theater until late November 1988. Defendant also wanted to pick up his last paycheck. Defendant left his job due to cash shortages in his register.

Schoppe testified that when the group decided to go to the movies, defendant said that they could rob the place. Schoppe thought he was joking, but defendant began to explain his plan. Defendant said he would get money from the manager's office when defendant went to get his check. The manager usually let defendant go into the office alone, and Olds would help by distracting the manager. Schoppe stated that he told the other two to "count [him] out."

After leaving Musicland, the three went to Schoppe's house and then to another friend's house, Brendan Mahoney. Defendant went inside Mahoney's house while Schoppe and Olds remained in the car. Mahoney testified that defendant asked him to go to the movies. Mahoney declined because he was afraid of Olds. Olds was angry with Mahoney because he would not get a weapon for Olds. Defendant told Mahoney that Olds would not be angry if he gave Olds some gloves. Defendant took some gloves and went back to the car.

Schoppe testified that while defendant was gone, Olds showed him a knife that was on the floor under the front seat. Olds told Schoppe that the knife belonged to Cory Hamerla, a friend of Olds. After 15 to 20 minutes, defendant returned, and they drove to an abandoned house between Plainfield and Aurora. Defendant told Olds and Schoppe that the house was a place where friends went to drink. They left the house without going inside and went to the theater.

The Cineplex Odeon theaters at Fox Valley Mall are in two separate buildings, the "big" building and "small" building. At approximately 7 p.m., the three went to the big theater and walked in without paying admission. Defendant signed a sheet and spoke to one of the employees. They remained in the big theater watching two movies for approximately two hours. They left the theater and went back to the car. Schoppe testified that defendant again talked about robbing the theater. Again, defendant and Olds told Schoppe that they really were not going to go through with the plan. They got in the car and drove to the small theater building.

Defendant went into the small theater and let Olds and Schoppe in through a back door. They went in and watched a movie for approximately 45 minutes. According to Schoppe, during that time defendant left the movie twice by himself and a third time with Olds. Defendant's first two trips were for candy and the bathroom. The third time, defendant told Olds that the manager was alone. Schoppe testified that he asked Olds if they were "really going to do this" and they said "yes." Schoppe stayed at his seat and watched the movie.

A short time later, defendant and Olds returned, and the three left through the same back door they entered. At the car, Olds squatted next to the car door until he was let in. Schoppe further testified that Olds had a wet spot on his coat. Defendant had no stains on his clothing. According to Schoppe, defendant said "I can't believe I did that. I feel like a scumbag." Later, when questioned by police, Schoppe told them that Olds made those statements.

While in the car, defendant told Schoppe that he had the $20 he owed Schoppe. Schoppe also testified that he saw Olds "fiddling with some money." Schoppe did not take any of the money and told them to take him home.

Schoppe testified that defendant and he had discussed robbing the theater on previous occasions. Defendant told Schoppe that it would be easy to go in, grab the cash box and walk out. Defendant did not discuss using violence to get the money.

Around midnight on December 23, Ronald Roberts was found dead in the office of the small theater. He had been stabbed several times in the back, stabbed in the abdomen, stabbed in the skull and had his throat cut. One of two safes in the office was open and was empty, except for some coins. An empty cash box was on the floor. The assistant manager estimated that $1,100 was in the safe.

The morning after the incident, defendant went back to Mahoney's house. Defendant returned $20 he had borrowed from Mahoney. Mahoney testified that he noticed defendant had a lot of money with him and asked defendant where he got it. Defendant told Mahoney that he robbed the theater with Olds and that Olds had done everything. Defendant also told Mahoney that the manager, Roberts, had been killed and that the "blood looked fake, just like in the movies." Mahoney testified that defendant also told him previously that if defendant were to rob the theater, it would be necessary to kill any witnesses.

Before the night of the robbery, defendant also told his plan to Thomas Kastrati, his neighbor. Kastrati testified that defendant told him Mahoney had said it would be easy to rob the theater and that

Mahoney would get guns. Defendant had also said that Olds wanted to rob the theater and would kill whoever was working that night. Kastrati also testified that defendant took him to the abandoned house. Defendant told Kastrati to bring a knife, which he did.

Kastrati was working at the theater on the night in question. Defendant had asked him that morning to sneak him into the theater. Kastrati testified that he told defendant no. That evening, Kastrati saw defendant at the small theater building at approximately 9:30 p.m. Defendant told Kastrati he was going to get his check after the movie and was not going to rob the theater.

After the incident, the police questioned Kastrati. Kastrati testified that the police asked him where defendant might hide something. Kastrati took the police to the abandoned house. There, they found a bloodstained jacket and a bloody knife hidden in the basement.

Defendant was subsequently taken into custody by the Aurora police on December 25, 1988. He was picked up while backing out of his driveway. A search of defendant's trunk produced, among other things, a bag of bundled money and two knives in sheaths hidden under a tire. Later that day, the police went to Cory Hamerla's house. Hamerla gave the officers a canvas bag, with Thomas Olds' name on it, that contained bundles of money. Hamerla also showed the officers a bag in the trunk of Hamerla's car that contained a pair of pants and boots. Both bags belonged to Olds. Hamerla testified that Olds came to his house on December 24, 1988, and asked Hamerla to keep those items for him. Hamerla also testified that he lent Olds a knife. Hamerla identified it in court and said Olds told him the tip of the knife broke off in a man's head. Olds told Hamerla that he stabbed Roberts by himself.

Defendant arrived at the Aurora police station after his arrest at approximately 5 p.m. on December 25. The police told him that his parents had been notified. At 5:30 p.m., defendant spoke with a juvenile officer, Ed Sweeney. Sweeney testified that he read defendant his *Miranda* rights and defendant waived his right to remain silent by signing a waiver form at 5:55 p.m. Sweeney testified that after signing the waiver form defendant asked him if he could stop answering questions if he chose to do so. Sweeney told defendant that he could stop answering questions at any point he wished. Sweeney left the room while defendant was questioned, but told defendant he would be right outside the room if defendant needed him. Defendant claims that he asked for his parents before questioning began and was told that they were being located.

Approximately 15 or 20 minutes after defendant was read his rights and questioning began, defendant's mother arrived at the station. Sweeney testified that he took defendant's mother to another room and explained defendant's situation to her. Defendant was questioned for about 5 to 15 minutes more after his mother arrived at the station. Malorie Peterson, defendant's mother, testified that she arrived at the station around 6 p.m. and was at the station for about one-half hour before she saw defendant.

At approximately 6:30 p.m., an assistant State's Attorney entered the room where defendant was being questioned. Defendant asked whether his parents had arrived. He was told that his mother was at the station. Defendant then told the officers that he would not make any more statements until he spoke with his parents and an attorney. The officers ended their questioning.

Two Aurora police officers, Al Tiegelmann and Gregory Anderson, testified that defendant stated that he and Schoppe went to the big theater to watch some movies. Defendant said that they then went to the small theater to watch another movie and pick up his check. They left afterwards. When defendant was asked about Olds, defendant stated that Olds was with defendant and Schoppe at the big theater, but remained there when Schoppe and he went to the small theater. Defendant denied any involvement in the homicide.

Defendant was convicted of first-degree murder and armed robbery. He was sentenced to natural-life imprisonment for the murder and 30 years' imprisonment for armed robbery. His post-trial motions and motion to reduce sentence were denied on June 4, 1990. A timely appeal was filed on the same day.

## MOTION FOR SUBSTITUTION OF JUDGES

Defendant first contends that his conviction must be reversed because his motion for substitution of judges was improperly denied. Defendant's case was originally assigned to Judge Robert Nolan. Judge R.A. Cox picked up Judge Nolan's call after Judge Nolan's retirement. Judge Nolan's retirement was effective December 5, 1988, according to the sworn affidavit of the assistant court administrator for the 18th Judicial Circuit.

Judge Cox presided over the case in courtroom 209 beginning on December 30, 1988. Judge Cox heard motions and made substantive rulings on the case. On April 26, 1989, Judge Cox presided over a hearing on defendant's motion to quash the arrest and suppress evidence. On June 12, 1989, after issues had been briefed by both sides,

Judge Cox heard arguments and said he would rule in writing within that same week.

Thereafter, Judge Cox had a heart attack. A memorandum written by Chief Judge Carl Henninger and dated June 29, 1989, was distributed to the courthouse staff, Judge Lucas and Judge Telander. In the memo, Judge Henninger assigned Judge Cox's court call to Judge Brian Telander "until [Judge Cox's] return." Judge Telander sat in Judge Cox's courtroom during this time, courtroom 209. Judge Telander's courtroom was 205.

On the next court date, July 17, 1989, Judge Telander presided for Judge Cox. He stated that "[Judge Cox] would like a date the first week of August" to rule on the outstanding motion. The case was continued until August 2, 1989. On August 2, Judge Telander told the parties that "[Judge Cox] asked me if you could return to the courtroom on the 21st. The ruling will be in writing, and I [Judge Telander] will publish it." The matter was continued until August 22 at 9 a.m. "for Judge Cox' [*sic*] ruling." The case was again continued until August 25th.

On August 25, Judge Telander told the parties that the ruling by Judge Cox would be in that day, but "it [needed] to be typed and reviewed by Judge Cox." The case was continued until September 7, 1989. On August 28, Judge Cox wrote a letter denying defendant's motion. On September 7, Judge Cox's ruling was entered by Judge Telander's order which stated that the motion was denied "for the reasons set forth in Judge Cox's written opinion of 8/28/89."

At the hearing on September 7, Judge Telander continued the case until September 29 for ruling on defendant's new motion to quash search warrant and suppress evidence and a motion to suppress statements, which was filed on June 20, 1989. On September 29, the matter was continued until October 19, 1989.

On October 19, Judge Thomas Callum was present in courtroom 209. Judge Callum had been assigned to courtroom 209 pursuant to an administrative order by Chief Judge Henninger, according to the sworn affidavit of the administrative assistant to the chief judge of the 18th Judicial Circuit. Judge Callum told the parties that he sat on the coroner's jury in the case so he was recusing himself. He continued the case until October 27.

On October 27, the case was transferred to the presiding judge for reassignment due to Judge Callum's conflict. Judge John Bowman, then presiding judge for Criminal I Division, formally assigned the matter to Judge Telander "for all further proceedings." An order

by Judge Telander, filed on October 27, continued the case until November 6, 1989, in courtroom 205.

On November 6, 1989, defendant made a motion for substitution of judges. Judge Telander denied the motion stating that the motion to quash the search warrant and suppress evidence was a motion filed in front of him. He also stated that the motion for substitution of judges was not filed at the earliest possible time.

Defendant argues that Judge Bowman's order assigning Judge Telander to the case placed the case on Telander's trial call. He also argues that Judge Telander made no substantive rulings on the merits of the case while he was substituting for Judge Cox, which he claims would preclude a motion for substitution of judge. See *People v. Emerson* (1987), 122 Ill. 2d 411, 424.

The State argues that defendant can be charged with knowledge of the assignment to Judge Telander before he was formally assigned to the case on October 27, 1989, citing *People v. Hanson* (1983), 120 Ill. App. 3d 84, 87. The State claims that the case was Judge Telander's immediately after Judge Cox's ruling denying the motion to suppress was entered. The additional motions to quash the search warrant and suppress statements were for Judge Telander to rule upon. Only a scheduling conflict between the court and defense counsel prevented Judge Telander from ruling on the motion on September 29, 1989.

Section 114—5(a) of the Code of Criminal Procedure of 1963 states:

> "(a) Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a).)

Defendant was charged by indictment with three counts of first-degree murder and one count of armed robbery. First-degree murder may be punishable by death or life imprisonment. (See Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3(c)(1), 1005—8—1(a)(1).) Thus, under section 114—5(a), defendant may name two judges as prejudiced. Defend-

ant's motion complied with section 114—5(a) in naming both Judge Telander and Judge John Nelligan as prejudiced.

The substitution of judges is an absolute right provided a timely, good-faith motion is filed alleging that the judge is prejudiced. (*People v. Walker* (1988), 119 Ill. 2d 465, 470.) Section 114—5(a) should be liberally construed to promote substitution and guarantee a fair and impartial trial. (*Walker*, 119 Ill. 2d at 470-71; *People v. Redisi* (1989), 188 Ill. App. 3d 797, 801.) If the motion for substitution of judges is improperly denied, all subsequent action by the trial court is void. *Redisi*, 188 Ill. App. 3d at 801.

Defendant relies on *People v. Flowers* (1977), 47 Ill. App. 3d 809, as the case most similar factually to the case at hand. In *Flowers*, the matter was assigned to Judge John Moran's courtroom after several continuances were granted by other judges. Judge Moran subsequently granted three continuances. On October 7, 1975, the case was called in Judge Moran's courtroom, room 1410, but Judge Robert Sulski was substituting for Judge Moran that day. Over defendant's objection, who answered ready and demanded trial, the State was granted a continuance. On November 25, Judge Zafiratos was presiding in room 1410. Both sides were ready for trial, but the case was reassigned *instanter* to Judge Sulski. At that point, defendant moved for substitution of judges. Judge Sulski denied the motion stating that the statutory 10-day period had passed since the case was first put on his trial call.

The Appellate Court, First District, reversed stating that there was no question the motion was made before Judge Sulski ruled on any substantive issues. The court also held that the case was placed on Judge Sulski's trial call when the formal assignment was made on November 25, 1975. The court's reasoning is particularly pertinent and worthy of repeating verbatim:

"It is true that on October 9, 1975, when defendant appeared in Room 1410, Judge Sulski was on the bench. Even though Judge Sulski was only substituting that one day for Judge Moran, the case could have proceeded to trial before Judge Sulski that day. Indeed, the defendant demanded trial and objected to the State's motion for a continuance. However the State was granted a continuance and the crucial fact is that when the continuance was granted the defendant no longer had any cause to believe that Judge Sulski would be the trial judge when the case again came up for trial, and thus had no further opportunity or reason to move (within the 10-day statutory period) for a substitution from Judge Sulski. The defendant could not have

known then that his case would not remain in Room 1410, nor could he have known that the case would be reassigned, let alone that it would be placed on Judge Sulski's call in another courtroom. Only when that in fact occurred on November 25, 1975, did defendant again know that Judge Sulski was assigned to preside at his trial." *Flowers*, 47 Ill. App. 3d at 811-12.

■ Although Judge Sulski substituted for Judge Moran for only one day in *Flowers*, the reasoning is applicable to this situation. Judge Telander did preside over five appearances by the defendant while substituting for Judge Cox, but did not rule on a substantive issue. The closest he came to that was when he entered the order on Judge Cox's ruling on the motion to quash defendant's arrest. The fact that Judge Telander was presiding for Judge Cox did not automatically put that case on his trial call.

The State's argument that the case became Judge Telander's after Judge Cox's ruling has no merit. The remaining two appearances over which Judge Telander presided resulted in no substantive rulings. Further, defendant is not deemed to have knowledge that the case was Judge Telander's at that point because Telander was still a substitute for Judge Cox sitting in Cox's courtroom. Defendant may have wasted his motion for substitution of judges by replacing a judge who was assigned to the case temporarily.

The State's argument that Judge Telander could have made a substantive ruling on September 25, 1989, concerning defendant's motion to quash the search warrant and suppress statements parallels the argument made in *Flowers*. As the court stated in *Flowers*, once the continuances were granted by the judge, the defendant no longer had reason to believe that particular judge would be the trial judge or would be assigned to the case. Similarly, defendant here had no idea at each appearance whether Judge Telander would remain a substitute for Judge Cox or whether Judge Cox would return. Also of significance is the fact that the case remained in courtroom 209, Judge Cox's courtroom, until formal assignment to Judge Telander.

The State's reliance on *Hanson* (120 Ill. App. 3d 84) is also misplaced. There, a jury docket was filed setting Hanson's trial for October 25, 1982, in front of Judge Bastien. On October 4, defense counsel's request for a continuance to the "next jury docket" was denied, but Hanson was granted a continuance on October 25. A jury docket filed January 10, 1983, again set Hanson's case for trial before Judge Bastien. Defendant made a motion for substitution of judges which was denied. The judge's order was affirmed on appeal because Hanson was on notice in October 1982 that the case was set before

Judge Bastien. Here, no documentation was filed assigning the case to Judge Telander before October 1989. Defendant cannot be charged with the same knowledge held by the defendant in *Hanson.*

The State also relies on *People v. Aldridge* (1981), 101 Ill. App. 3d 181, for the proposition that counsel's experience in a particular court system and knowledge of court procedures can be significant in charging defendant with knowledge of a judicial assignment. In *Aldridge,* the circuit court had one felony courtroom that judges were assigned to on a rotating monthly basis. Defendant was charged with knowledge of which judge was being assigned next because this information had been published and counsel was aware of the rotation system.

This case is inapposite to defendant's situation. Judge Telander was not assigned through a standard procedure, but was assigned through an "inter-office memo." Defendant cannot be charged with knowledge of a procedure that is not uniformly applied or routinely published for courtroom participants.

Fairness dictates that defendant is charged with knowledge of the assignment to Judge Telander when the case was formally assigned to him by Presiding Judge Bowman on October 27, 1989. Thus, defendant's motion for substitution of judges made on November 6 was timely. We hold that the trial judge erred in denying defendant's motion. As such, we reverse the defendant's conviction and remand for a new trial.

Because we conclude that the denial of defendant's motion for substitution of judges entitles him to a new trial, we need not address defendant's remaining contentions. However, we address the issues that may arise on retrial.

### ACCOMPLICE INSTRUCTION

Defendant's second contention is that the trial court erred in refusing to give a jury instruction on accomplice testimony. We first note that defendant argues on appeal that Hamerla, Mahoney and Kastrati could all be considered accomplices. Because defense counsel only argued that Hamerla was an accomplice at the time the instruction was tendered, we deem defendant's argument waived as to Mahoney and Kastrati. See *People v. Travis* (1988), 170 Ill. App. 3d 873, 889.

■ The test for determining whether an accomplice instruction should be given is whether there is probable cause to believe the witness is guilty as a principal or on an accountability theory. (*People v. Cobb* (1983), 97 Ill. 2d 465, 476.) Based on this test, we conclude that the trial court did not err in refusing to give the accomplice instruc-

tion. Defendant argues that Hamerla could be considered an accomplice because he supplied Olds with the murder weapon and helped Olds conceal evidence after the fact. As such, defendant suggests that Hamerla might have known of the plan in advance. Defendant concludes that under these circumstances there was probable cause to believe Hamerla could have been indicted under the accountability theory.

■ We agree with the State's argument that defendant improperly views probable cause as a minimal threshold. Probable cause is not satisfied by asserting that a witness "might have known of the plan in advance." Defendant further relies on *People v. Furby* (1990), 138 Ill. 2d 434, for the proposition that a person furnishing items used in furtherance of the offense can be held accountable. However, the evidence failed to show that Hamerla had the "intent to promote or facilitate [the commission of the offense.]" (See Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) Without sufficient evidence of intent, Hamerla could not be found guilty on an accountability theory. We hold that the trial court did not err in refusing to give the accomplice testimony instruction.

### PHOTOGRAPHS AND BLOOD IN JURY ROOM

Defendant's third contention is that reversible error occurred when photographs of the decedent and containers of human blood were sent to the jury room. Defendant argues that the prejudicial effect of both the photographs and the blood outweighed their probative value. These items, defendant claims, are not needed to establish a material fact in controversy in the case. Additionally, defendant asserts that some of the photographs were taken in such a way as to enhance their prejudicial impact.

The photographs displayed decedent's wounds. Three pictures showed the knife wound to decedent's neck, which extended from ear to ear. Two other pictures were of the decedent's skull showing the wound where the knife fragment was found. Another picture displayed six stab wounds to decedent's back. The final two pictures depicted slicing wounds to decedent's fingers. The blood in the containers came from the crime scene.

It is the trial court's function to weigh the probative value and prejudicial effect of evidence. (*People v. Shum* (1987), 117 Ill. 2d 317, 353.) The trial court has discretion in deciding when evidentiary items should be taken into the jury room, and its decision will not be reversed absent a showing of prejudicial abuse. (*Shum*, 117 Ill. 2d at 353.) Photographs that are relevant to establish a fact in issue are not

inadmissible because they are gruesome or disgusting. *People v. Lucas* (1989), 132 Ill. 2d 399, 439.

We agree with the trial court's decision that the photographs had significant probative value. The number, location and angle of the wounds, which are displayed in the photographs, are relevant in determining whether more than one knife was used to make the wounds. The number of wounds is also relevant in determining whether the decedent lost a large amount of blood. The lack of blood on defendant's clothing was a point of controversy between the two sides. Further, showing different angles of the decedent's wounds does not enhance the prejudicial effect of the photographs.

The cases cited by defendant do not require a different result. In *People v. Lefler* (1967), 38 Ill. 2d 216, and *People v. Landry* (1977), 54 Ill. App. 3d 159, the photographs were not probative because, for the most part, the photographs displayed incisions made during the autopsy and not the wounds inflicted during the crime. In *People v. Garlick* (1977), 46 Ill. App. 3d 216, the photographs were not probative because the defendant admitted that he committed the offense and was using the insanity defense. In the case at hand, the photographs were relevant to the jury's determination of whether defendant participated in the stabbing.

■ Defendant's claim that the containers of blood had no probative value has merit. The State claims that the blood was given to the jurors to corroborate the chain of custody testimony. Yet, defense counsel made no objection to the chain of custody. There was testimony that defendant had blood of the victim's type on his shoe. But, the jurors did not need the actual blood to verify or reject this testimony.

Although we find that it was error to send the containers of blood to the jury, the error was harmless. In determining whether error is harmless, the issue is whether the jury might have relied upon the evidence in reaching its verdict. (*People v. Parmly* (1987), 117 Ill. 2d 386, 396.) It is speculative at best to believe that the jurors relied on a container of blood in finding defendant guilty of first-degree murder and armed robbery. More likely, the jurors viewed the containers of blood and determined that the blood would not help them reach a decision.

### SUPPRESSION OF DEFENDANT'S STATEMENTS

Defendant contends that the statements he made to the police should be suppressed because his mother was at the police station but was not allowed to see him. He argues that when he, a 16-year-old,

was isolated from his mother by the police, the police did not exercise proper care in assuring that his statement was free from compulsion.

Defendant does not claim a violation of the Juvenile Court Act of 1987 (Act) (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*), but his argument implicitly raises this issue. Section 5—6 of the Act requires that a delinquent minor's parents be notified that the minor has been taken into custody. The minor also should be taken to a juvenile officer. (Ill. Rev. Stat. 1987, ch. 37, par. 805—6(2).) In *People v. Arias* (1989), 179 Ill. App. 3d 890, the court found that section 5—6 of the Act was violated when police refused the minor's request to contact his father.

■■ We find that section 5—6 was not violated here. We believe the result would be different if defendant asked to speak with his mother and the request was denied. However, when defendant asked for his parents, he was told that his mother was at the station, at which point all questioning ceased.

Even assuming *arguendo* that section 5—6 of the Act was violated when defendant's mother was not allowed to see him, defendant's statement should not be automatically suppressed. As with adults in custody, the test to determine whether the statements given should be suppressed is the totality of the circumstances test. (*Arias*, 179 Ill. App. 3d at 898; *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401.) Factors that the court considers to determine whether a statement was voluntary include the defendant's age, experience, intelligence and physical condition as well as whether defendant was threatened, physically abused or promised anything in exchange for a statement. (*People v. Martin* (1984), 102 Ill. 2d 412, 427; *Stachelek*, 145 Ill. App. 3d at 401.) The violation of section 5—6 of the Juvenile Court Act is only one factor in determining whether the defendant's statement should be suppressed. *Arias*, 179 Ill. App. 3d at 897; *People v. McGhee* (1987), 154 Ill. App. 3d 232, 236-37.

Based on the totality of the circumstances, we hold that defendant's statements should not be suppressed. Defendant testified that he understood his *Miranda* rights. Defendant was indeed a minor, but the evidence does not reflect that he lacked the intelligence to understand what was happening. Defendant spoke with a juvenile officer before answering questions. The record does not reflect that defendant was threatened, physically coerced or promised anything in exchange for his statements. Defendant was not deprived of food or sleep. He was not unreasonably detained. Even if defendant's mother's request to see her son is considered as a factor weighing in favor

of suppressing defendant's statement, this factor alone does not mandate that defendant's statement be suppressed.

The three cases cited by defendant to support his argument are distinguishable. In *People v. Knox* (1989), 186 Ill. App. 3d 808, the defendant was not able to see his mother *and* a juvenile officer was not present. In *McGhee* (154 Ill. App. 3d 232), and *People v. Berry* (1984), 123 Ill. App. 3d 1042, the totality of the circumstances warranted that the juvenile's statement be suppressed. Here, the totality of the circumstances warrants that defendant's statement not be suppressed.

## HEARSAY STATEMENTS OF COCONSPIRATOR

Defendant next contends that error occurred when the statements of his coconspirator, Olds, were introduced through Hamerla's testimony. Hamerla testified that the day after the incident Olds told Hamerla that he (Olds) was in trouble. Olds had robbed the theater and killed the theater manager. Olds did not know what to do with the money. On cross-examination, defense counsel elicited testimony from Hamerla that Olds told him the tip of the knife Hamerla lent Olds was broken in the victim's head. Hamerla also testified on cross-examination that Olds said that he stabbed the manager by himself. On redirect examination, Hamerla testified that Olds said defendant told Olds to kill the manager because defendant was scared.

Defendant argues that Olds' statements were not made in furtherance of and during the conspiracy. He claims that Olds' comments to Hamerla were admissions of guilt and Olds' reason for killing Roberts, both of which are not statements made to further the conspiracy or conceal the offense. The State argues that the testimony on direct examination was within the coconspirator exception. The State adds that the testimony on redirect examination was invited by the cross-examination.

The coconspirator exception to the hearsay rule allows statements in furtherance of and during the conspiracy to be admitted against other coconspirators upon a *prima facie* showing of a conspiracy. (*Parmly*, 117 Ill. 2d at 393.) Coconspirator statements made after the fact to conceal the offense are also admissible under the coconspirator hearsay exception. *People v. Link* (1981), 100 Ill. App. 3d 1000, 1006.

■ We find that Olds' conversations with Hamerla elicited on direct examination came within the coconspirator hearsay exception. Olds told Hamerla that he had stolen money and needed to know what to do with it. Olds explained to Hamerla that the money was taken from the theater and the theater manager was killed. The en-

tire premise of Olds' conversation with Hamerla was to seek advice about what to do with the stolen money. Olds wanted Hamerla's help in concealing the crime. As such, the conversation elicited on direct examination between Olds and Hamerla was admissible.

■ Defendant also argues that the testimony on redirect examination was inadmissible. On cross-examination, defense counsel evoked testimony from Hamerla that Olds told him about the stabbing in detail. We find that this testimony did invite the redirect testimony that defendant told Olds to kill the manager. Defense counsel brought out the testimony that Olds stabbed the victim by himself. This testimony allowed the prosecution to admit the remaining part of that conversation to show whose idea it was to kill the theater manager. If one party introduces part of a statement, the opposing side may introduce the remaining part of the statement to convey its full meaning to the jury. (*People v. Williams* (1985), 109 Ill. 2d 327, 334.) We conclude that Hamerla's statements on redirect examination were admissible as invited responses.

### EVIDENCE OF PRIOR THEFTS

Defendant's sixth contention is that the trial court erred in admitting evidence that defendant was accused of prior thefts from the theater. Kevin Mooney, a manager at the Cineplex Odeon Theater, testified that defendant was employed by the theater in 1988. In November 1988, defendant was given the alternative to quit or be fired because his cash register had been short. The State contends that this testimony does not automatically imply that defendant stole money from the theater. Even if construed as evidence of prior theft, the State argues that it is admissible to show defendant's motive.

Evidence of other crimes is admissible for almost any purpose other than to show the propensity to commit crimes. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) Other crimes evidence is relevant to prove design, motive, knowledge or *modus operandi*. (*Lucas*, 132 Ill. 2d at 429.) The trial court's decision to admit evidence of other crimes will not be reversed absent a clear showing of an abuse of discretion. *People v. Smith* (1990), 199 Ill. App. 3d 839, 852-53.

■ We hold that the trial court did not abuse its discretion in allowing Mooney's testimony. While defendant argues that there was a "strong implication" of prior theft by defendant, that is only one inference that may be drawn from that testimony. Defendant may have had difficulty in making change or was generally careless in running a cash register. Even assuming a strong implication of prior theft by defendant, the testimony is relevant to show his potential motive of

revenge toward the managers at the theater. As such, the evidence was admissible.

We note that defendant argues in a footnote in his brief that a proper limiting instruction should be given when the jury is presented evidence of prior misconduct. Defendant seems to be implicitly arguing that the court's failure to do this constituted plain error. The two cases cited by defendant, *People v. Conners* (1980), 82 Ill. App. 3d 312, and *People v. Manley* (1971), 133 Ill. App. 2d 882, do not support defendant's plain error argument. In *Conner*, the instruction given was so broad as to create a prejudicial effect. In *Manley*, the court refused to give an instruction concerning the defendant's prior conviction. *Manley* is distinguishable because no instruction was requested by defendant in this case. Generally, the court is under no obligation to give instructions not requested by counsel. *People v. Carlson* (1980), 79 Ill. 2d 564, 583.

### KNIVES ADMITTED INTO EVIDENCE THAT WERE NOT THE MURDER WEAPON

Defendant contends that it was error to admit into evidence two knives found in the trunk of his car. The State counters that this issue has not been properly preserved for appeal. We agree.

An issue must be raised both in the trial court and in defendant's post-trial motion to be preserved for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) "Catch-all" arguments in post-trial motions do not preserve unspecified claims of error on appeal. (*People v. Bailey* (1979), 77 Ill. App. 3d 953, 956.) The failure to preserve an issue for appeal results in waiver. *Shum*, 117 Ill. 2d at 348.

Defendant argues that this error was raised at trial and included in his post-trial motion under his claim of error for denying his motion *in limine* concerning testimony about the knives. Preserving the issue of testimony about the knives is not the same as preserving the issue of whether the actual knives should have been admitted. We hold that this issue is waived.

■ Assuming no waiver, the trial court did not err in admitting the knives. The knives are admissible if there is evidence to connect them with the defendant and with the crime. (*People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 652.) It is not necessary to show that the particular weapon was the one used in the offense. *People v. Johnson* (1966), 35 Ill. 2d 516, 518.

The knives were found in defendant's automobile, thus connecting defendant to the weapons. Defendant argues that the knives were admitted solely to suggest that defendant was a violent person. How-

ever, other evidence was presented from which it can be inferred that the knives were connected to the armed robbery. The number of stab wounds on decedent's body is evidence that more than one person may have stabbed decedent. There was testimony that defendant obtained a knife from a friend shortly before the crime. Also admitted were defendant's statements that he would have to kill whoever was in the office during the robbery. We find that this evidence is sufficient to connect the weapons found in defendant's car with the offense.

We find issues 8 through 10 to be moot and choose not to address them.

Defendant's conviction is reversed, and the case is remanded for a new trial because his motion for substitution of judges was improperly denied. The other six issues we addressed do not support a reversal of his conviction. We note that the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10.

Reversed and remanded for a new trial.

WOODWARD and GEIGER, JJ., concur.