THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES MONTGOMERY, Defendant-Appellant.

First District (3rd Division)   No. 1—90—0924

Opinion filed September 29, 1993.

Michael J. Pelletier and Nan Ellen Foley, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore Burtzos, and Sharon L. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

A jury found defendant James Montgomery guilty of the murder of Donald Patterson and he was sentenced to 35 years in prison. A previous jury trial had ended in a mistrial when the jury was unable to agree on a verdict.

On appeal, defendant argues: (1) the trial court erred in refusing to give an accomplice-witness instruction offered by defendant, where there was probable cause to arrest the State's main witness for the same murder; (2) the State improperly elicited testimony of a prior consistent hearsay statement by its main witness; (3) the State improperly bolstered the credibility of its main witness where the assistant State's Attorney volunteered several statements during testimony that his job was to determine the truth through investigation; (4) the State improperly bolstered witnesses by virtue of their status as prosecutors and police officers, by implying that law enforcement officials do not charge the wrong persons, and by shifting the burden of proof by implying that defendant must prove that the State's witnesses are lying; and (5) the State improperly cross-examined defendant's witness on collateral issues, thus prejudicing defendant's case since this witness contradicted the testimony of the State's main witness.

We reverse and remand for a new trial for specific and cumulative errors, including the trial court's improper refusal to allow defendant an accomplice-witness instruction and the State's improper bolstering of the credibility of its key witness, law enforcement witnesses and prosecutors.

The charges arose from the March 10, 1987, fatal shooting of Donald Patterson. The State's key witness, Tony Wells, testified that he was employed by a car dealership as a buyer and detailer. Wells stated that on the day before the murder, he accompanied defendant, whom he had known for five to six years, and defendant's cousin, Carl Varrie, to Michigan City, Indiana, where Varrie lived. On the

morning of March 10, he accompanied defendant and Varrie to a gun shop in Michigan City where defendant purchased a holster. Wells stated that defendant placed a .38-caliber gun, which defendant had in his possession, into the holster to see how it fit, and defendant then attached the holster to the left side of his belt. Defendant and Wells then returned to Chicago.

Wells further testified that on that evening at approximately 8 to 9 p.m., defendant phoned Wells to tell him that someone had broken the windshield on defendant's mother's car, and that defendant believed the perpetrator was Donald Patterson, the victim. Wells then picked up defendant in his mother's white Buick and the two drove around looking for Patterson. They eventually observed him and parked the car, but Patterson entered a nearby house. As they returned to the car, Patterson approached them and stated that he wished to talk. Patterson told defendant that his mother was lying when she said that it was Patterson who had broken the windshield of her car.

Wells stated that he stood to the side as defendant and Patterson discussed the windshield, but he finally suggested they both talk to defendant's mother. Patterson agreed and rose from where he was sitting on the bumper of Wells' car. Wells testified that defendant then pulled out a .38-caliber gun from his holster and fired into Patterson's chest as Patterson stood with his back to the car and next to Wells. Wells then began to walk away and heard four more shots approximately 5 to 10 seconds after the first shot, whereupon Wells then ran down an alley.

Wells testified that he walked around for approximately 40 minutes and then went to defendant's home, where he told defendant's mother that her son had just shot someone. Wells stated that defendant's mother told him to call Varrie and Wells did so, then he walked with defendant's mother to the police station. Wells returned to defendant's home and later returned to the crime scene to retrieve his mother's car.

Police contacted Wells' mother when they verified that she owned the white Buick after other witnesses told police that the parties had been standing near the car. The police later arrived at Wells' house to take him to the police station for questioning.

On cross-examination, Wells was shown photographs of the scene depicting a puddle of blood and the victim's body across the street from Wells' parked car rather than near the car. There was no blood on the car at all and no blood between the car and the puddle of blood near the victim's body.

Officer Kupczyk testified that on March 10, 1987, at approximately 11:15 p.m., he and his partner, Officer Panek, were driving east on 59th Street when they heard two "muffled reports" and drove toward the sounds. As they turned onto May Street from the corner of 59th Street, they heard a clear gunshot. They looked south on May Street and saw a black male, whom they identified as defendant, standing at the entrance to the alley.

As defendant fled down the alley, the officers saw the victim's body at the entrance to the alley in a pool of blood. Kupczyk stated that when he apprehended defendant, defendant had a holster attached to his belt. Approximately 10 officers and police dogs searched for a gun for approximately one hour, but none was found. Further, there were no other eyewitnesses to the shooting.

Gunshot residue tests performed on defendant indicated a presence of lead, barium and antimony on his right palm, the back of his right hand and the back of his left hand. Defense expert Mark Boese testified that based upon this evidence, he could not say that Montgomery had fired a gun, much less fired one five times. Boese believed that if defendant had fired the gun five times, the levels of lead would be significantly higher. Boese did state that defendant may have held a discharged firearm, or that it was possible defendant had lead on his hands from his job painting lightbulbs and had barium and other metals on his hands from looking at used cars the day of the murder. Boese stated that these elements can be rubbed off by many ordinary activities.

In rebuttal, Assistant State's Attorney David Cuomo testified to defendant's in-custody statement. Defendant initially denied involvement in the shooting, but Cuomo stated that after he showed defendant Wells' written statement inculpating him, defendant made a statement. That statement explained that Wells drove defendant to a pool hall the night of the shooting, they stayed a few minutes, and Wells drove him home. A while later, as defendant passed 59th and May Streets on his way to the store, he saw the victim talking with a dope dealer named "Slim" and he saw Slim shoot the victim. At trial, defendant admitted this statement was falsely made.

Dr. Chaku Teas, the State's forensic pathologist, testified that the victim died of multiple gunshot wounds: three to the head, one to his chest and one to the shoulder. The doctor testified that it is possible to be shot in the chest and walk, and possible that a chest wound would not spurt blood because the blood may pool in the chest's cavities which might explain the placement of the body across the street from the white Buick and the absence of a bloody trail. Dr. Teas also

found multiple areas of abrasion on the victim's eyebrow, forehead, eye, nose, lip, right knee, right side, right hand and wrist; and a laceration at his right eyebrow, which would tend to support defendant's testimony that the defendant and the victim were engaged in a violent fist fight before the shooting.

Carl Varrie testified for the defense that it was defendant's mother, and not Wells, who called him, and that when he arrived at defendant's house to accompany defendant's mother to the police station, Wells was not there and did not accompany them to the station. Varrie stated that after he left the police station, he went to Wells' home, where Wells told him that Wells' "play" father, Willie Holly, told Wells to make a statement against defendant before defendant made a statement against him. Wells' mother testified that Wells considers Holly, a guard at the Cook County jail, to be his "play" father.

Defendant testified that although he was an ordained minister at the time of the shooting, he also worked a temporary job fixing, painting and wrapping fluorescent light bulbs, where the paint had a lead base. Defendant stated that on the morning of the murder, he did not go to a gun shop in Michigan City, nor did he purchase a holster, but he did observe Wells wearing a holster that day and on days prior. Rather, on the day of the shooting, he and Wells had looked at used cars, jump-starting them, looking underneath the hoods, and checking underneath for leaking fluid. Defendant stated that he did not change his clothes or wash his hands between leaving work at 4 p.m. on March 9, 1987, and his arrest the following evening, because he knew he would be getting dirty looking at used cars.

When defendant arrived in Chicago on the evening of the murder, he phoned Ray Terrell and arranged to borrow his car to enable him to pick up his girl friend, Melissa Bullock, from work. Both Terrell and Bullock confirmed that this had been arranged. Defendant stated that as he walked to Terrell's to pick up the car, Wells pulled up and offered him a ride in the white Buick.

Defendant testified that on their way to Terrell's, Cornell Gandy flagged them down near an alley at 59th and May Streets and defendant exited the car and walked across the street to talk to him while Wells stayed in the car. Gandy informed defendant that Patterson had been vandalizing cars in the neighborhood, but defendant was already aware that his mother's car had been vandalized. As defendant spoke to Gandy, Patterson approached from behind defendant and Gandy left. Defendant stated that he wanted to avoid a confrontation with Patterson and started to walk back to Wells' car, but never made it across the street.

Patterson and defendant stood near the alley and Patterson asked him "Aren't you that bitch's son that filled out a police report against me?" Defendant stated that Patterson went into a rage yelling, "You all must don't know who I am. I am a Gangster Disciple. *** Don't nobody fill out no police report against me." Wells remained in the car during this exchange.

Patterson then lunged at defendant and attempted to punch him several times. Defendant ducked, then finally punched Patterson in the face, breaking his glasses. Patterson then charged defendant, defendant ducked down and Patterson pulled defendant's coat up over his head, so that defendant was unable to see. Patterson then began punching defendant in the stomach and chest, while defendant continued to duck, facing the ground with his coat pulled over his head. Defendant then heard a shot and felt Patterson release him. Defendant then rose to see Wells walking toward Patterson from his car, with a gun in his right hand and a holster in his left hand. After the first shot, Patterson had turned to face Wells, then turned away from him, but Wells continued walking and shooting at him. Patterson then fell and defendant saw Wells standing over the victim and shooting, getting blood splattered on his clothes in the process.

Wells then immediately yelled, "Run James" and fled through an alley, but defendant just stood there "in amazement." As Wells fled, he attempted to throw his holster underneath his car, but it hit the wheel well. Wells kept the gun in his hand. Defendant stated that just about the time that Wells had fled to the entrance of the alley, defendant observed a police car coming down the street. Defendant testified that as the police approached, defendant was halfway turned toward the alley, watching Wells run away and approximately three to four feet from the victim.

Defendant admitted that he falsely told Assistant State's Attorney Cuomo that "Slim" shot the victim because he was trying to protect Wells. Defendant testified that while the State's Attorney did tell him that Wells inculpated him, the State's Attorney refused to show defendant Wells' statement, so defendant believed that the State's Attorney was bluffing. Cuomo admitted on cross-examination that the felony review memo does not state that defendant was shown Wells' statement. Defendant denied that the assistant State's Attorney asked about the holster or that defendant told him he used it to carry a BB gun. Defendant testified that he never owned a gun nor had he ever used a gun.

Defense witness Eric Bennett testified that on March 10, 1987, at 11:30 p.m., he was driving down May Street and saw Wells running,

but did not see a gun in his hand. Bennett stopped and Wells told him that he was trying to leave the neighborhood, because "he just shot a guy that James was fighting with." As Bennett drove Wells to Wells' mother's house, he saw the handle of a revolver in Wells' left jacket pocket. Bennett admitted that he was twice convicted of burglary and once convicted of possession of a stolen motor vehicle. Bennett was also impeached with his prior testimony that Wells had said "some shooting started" without identifying himself as the shooter. The State also presented Bennett's prior testimony that Wells was "holding his hand like he had a gun or something *** I saw a bulge" to impeach Bennett's testimony that he saw a gun handle.

Gandy testified on rebuttal, denying that he was near 59th and May Streets at 11 p.m. that night. He also denied flagging down defendant and Wells to tell them about Donald Patterson. Gandy also admitted that he had been convicted twice for possession of PCP and once for delivery of PCP.

Evidence was admitted that Wells was convicted in 1983 for possession of a stolen motor vehicle and convicted in 1985 for retail theft. There was also testimony that he told a defense witness, Deneen Carter, that he was going to "jump on" Eric Bennett, another defense witness, because Wells thought Bennett was "lying on" Wells when Bennett testified for defense.

Deneen Carter also testified that Wells asked her to ignore any subpoena to testify for defendant and said that she should go to work instead of going to court. Carter testified that she had dated Wells and knew he kept a gun behind the radio in his car. Wells had also instructed her to testify that the gun she observed was not a real gun, but a BB gun.

The defense presented 18 witnesses.

Some testified they were well acquainted with defendant and did not know him to carry a gun, but that Wells was known to keep a gun under the dashboard of his car, had a violent temper, and had threatened some of the witnesses with a gun. Additionally, three ministers testified as to defendant's reputation as a peaceful person.

Defendant first contends that the trial court erred in refusing to give an accomplice-witness instruction tendered by defendant since the evidence showed there was probable cause to arrest Wells, either as an accessory or as a principal, for Patterson's murder.

While defendant may have waived this issue by failing to file a complete post-trial motion, we choose to review it here since we believe it affects defendant's substantial rights and the evidence was closely balanced. 134 Ill. 2d Rules 615(a), 451(c).

Defendant offered the following instruction, to which the State objected and which was refused by the court:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in the light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981).

A defendant is entitled to an accomplice-witness instruction if there is probable cause to believe the witness was guilty as a principal or as an accessory on the theory of accountability. *People v. Henderson* (1990), 142 Ill. 2d 258, 314, 568 N.E.2d 1234; *People v. Cobb* (1983), 97 Ill. 2d 465, 476, 455 N.E.2d 31; *People v. Robinson* (1974), 59 Ill. 2d 184, 191, 319 N.E.2d 772; *People v. Pace* (1992), 225 Ill. App. 3d 415, 426, 587 N.E.2d 1257.

A jury should receive the instruction if the totality of the evidence and the reasonable inferences drawn from the evidence establish probable cause to believe not merely that the person was present and failed to disapprove of the crime, but that he participated in the planning or commission of the crime; if probable cause is established, the instruction should be given despite the witness' protestations that he did not so participate. *Henderson*, 142 Ill. 2d at 315; *Cobb*, 97 Ill. 2d at 476.

The defense, as well as the prosecution, is entitled to appropriate instructions which represent its theories of the case, if such theories may be reasonably inferred from the facts. *People v. Carlson* (1992), 224 Ill. App. 3d 1034, 1043, 586 N.E.2d 1368.

■■ We find that it may be reasonably inferred from the evidence that Wells was the shooter; thus, defendant was entitled to the accomplice-witness instruction.

While the trial court refused the instruction because Wells "never said he was involved in the crime," *Henderson* specifically disregards that standard by the court's statement: "[I]f probable cause is established, the instruction should be given despite the witness' protestations that he did not so participate." *Henderson*, 142 Ill. 2d at 315.

Here, the defense presented evidence that Wells was the principal in that:

> (1) defendant testified that he saw Wells shoot the victim, and the pathologist's findings that the victim had several fresh cuts and lacerations supports defendant's testimony that he was fighting with the victim when Wells first started shooting;

(2) physical evidence corroborates defendant's testimony since the victim was found near the entrance to the alley and not near Wells' car, and there was no blood on or near the white car;

(3) Bennett, although impeached by a prior statement, testified that he saw Wells shortly after the shooting and that Wells stated that he had "just shot a guy that James was fighting with" and stated that he observed the handle of a revolver in Wells' left jacket pocket;

(4) testimony by five witnesses who knew Wells to keep a gun behind the dashboard of his car and had seen him withdraw it to threaten themselves or others;

(5) testimony that Wells had intimidated defense witnesses Bennett and Deneen Carter so that they would not testify for the defendant, implicating Wells;

(6) Carl Varrie's testimony that Wells told him that his "play" father, a guard at the Cook County jail, advised him the night of the shooting to make a statement against defendant before defendant made a statement against him; and thus, there was sufficient evidence with which to indict Wells as a principal and the instruction should have been given.

Further, we find the absence of such an instruction was not harmless error since the evidence was very close and the State's case rested upon Wells' credibility as its key witness. An accomplice-witness instruction would have affirmatively admonished the jury to consider Wells' testimony with caution and suspicion, whereas the general instruction does not.

Defendant next argues that the State improperly elicited from Detective Lane, through cross-examination, evidence of Wells' prior consistent statement, and then argued that Wells was more believable since he had maintained a consistent statement from the beginning.

The record contains two pages of Detective Lane's revelation of the content of Wells' statement, including this exchange:

"[Prosecutor]: Did he further tell you that the defendant pulled the weapon from inside his left side jacket and fired one shot into the chest and stomach area of Donald Patterson?

[Witness]: Yes."

The State also returned to Wells' prior consistent statement in its cross-examination of defendant:

"Q. And that statement, Assistant State's Attorney Cuomo told you that Tony Wells said you were the one that killed Donald Patterson.

A. Yes. They told me that on 61st Street."

Prior consistent statements unfairly enhance a witness' credibility because a jury is more apt to believe something that is repeated; thus, prior consistent statements are inadmissible except to rebut a suggestion that a witness recently fabricated testimony or has a motive to give false testimony, and the prior statement was made before the motive arose. *Henderson*, 142 Ill. 2d at 310-11; *People v. Harris* (1988), 123 Ill. 2d 113, 139, 526 N.E.2d 335.

The prejudicial nature of evidence of prior consistent statements is determined on a case-by-case basis. *Henderson*, 142 Ill. 2d at 311.

In *Henderson*, the prosecutor asked the witness upon redirect:

" 'Anthony, did you tell the police officers that night essentially the same thing that [you're] telling the ladies and gentlemen of the jury?' *** 'Yes, something like that.' " (142 Ill. 2d at 309.)

The court determined that this was evidence of a prior consistent statement and was inadmissible since the witness' motive to protect the two defendants, his brother and a good friend, existed at the time he gave the statement to the police. *Henderson*, 142 Ill. 2d at 310-11.

However, the court there found it harmless error since it did not believe the evidence was closely balanced; did not find that defendant was denied a fair trial because of the admission of the statement; did not find that the witness' credibility was enhanced since it was the witness himself who testified to his own prior consistent statement; and did not find the testimony to be a specific reference to the prior statement, but was only a general reaffirmation that did not repeat the prior statement to the jury. *Henderson*, 142 Ill. 2d at 311.

In the instant case, however, we find the admission of the prior consistent statement of the State's key witness improperly bolstered Wells' credibility since the evidence was closely balanced and the State's case turned on Wells' credibility; the jury could have given more weight to the fact that Detective Lane testified as to the statement; and the exchange repeated the specific information which Wells had earlier related to police.

While we might not have determined this error to be reversible in the absence of other errors in this case, we find that this error contributes to the cumulative effect of the errors prejudicing defendant such that he was denied a fair trial.

Defendant next contends that Wells' testimony was unfairly bolstered where a prosecutor from the felony review unit volunteered several times that he was merely stating the "truth."

In cross-examination of Assistant State's Attorney Cuomo, defense counsel inquired whether Cuomo was there to charge defendant, and Cuomo responded, "No, I was there to assist the police in the investigation and try to come to [a] determination of what the truth was."

Defense counsel later asked Cuomo if Detective Lane told Cuomo only Lane's version of what had happened and Cuomo replied, "Detective Lane told me what his investigation was. And let me be the evaluator of what the truth was."

Defense counsel asked Cuomo if he thought it was important to inform the jury that Cuomo had showed Wells' statement to defendant and Cuomo stated, "I feel what's important to tell the ladies and gentleman of the jury is the truth." After defense counsel questioned him further on that issue, Cuomo answered, "I—there's no way of answering that question. The only [thing] that's important for me is to tell the truth."

Defense counsel then asked if it was Cuomo's intent to cause defendant to appear to be lying and Cuomo responded, "No, I'm just trying to tell the truth. I don't know what James Montgomery said before I got up here."

■ We do not believe this testimony is error, given the context of the answers. The record demonstrates that the answers given were in response to defense counsel's attempts to ascertain whether Cuomo had made an independent evaluation of the evidence from his interviews with Wells and defendant. In fact, defense counsel actually invited Cuomo several times to give his opinion.

However, we do find that the State unfairly bolstered its witnesses' credibility when it commented several times in closing arguments on their status as prosecutors and police officers and in stating that law enforcement did not work hard to convict the wrong people.

In closing arguments, the prosecutors made several comments invoking the status of its witnesses, including these statements:

"[Assistant State's Attorney Cuomo is not] going to put his career on the line and lie for this—lie to convict this individual. If you were to believe the defendant's story, [you are saying ] that assistant State's Attorney Cuomo is lying ***."

In rebuttal, the State commented:

"[Is there] any reason any one of the 8 to 10 officers that testified before you had reasons to lie. Any reason assistant State's Attorney Cuomo. [sic] Oh, he's not putting his job on the line. He's not tape recorded. He is. If he comes in here and

lies to you, he is putting his job on the line. That is his job. That's his career.

\* \* \*

Ladies and gentlemen, have faith in our system \*\*\* Our system involves police officers. Our system involves prosecutors. Our system involves eyewitnesses, occurrence witnesses. Have faith in our system. When you say that everyone lied but still, have faith in that system that's there for you. Don't believe any police officer. Believe that prosecutors want dope dealers out on the street. Prosecutors who represent the People of the State of Illinois. That put drug dealers in jail as often as they can. But don't believe any of those people because they are all lying \*\*\*.

You can have faith in your system because a—people like Officer Panek and Officer Kupczyk who go out day in and day out. And they risk their lives for people like you. People who live in the City of Chicago. They chase down persons who still might have a gun like James Montgomery.

\* \* \*

But see, defense counsel wants you to believe \*\*\* we all want dope dealers out on the street, we want to convict the wrong people. Let murderers run free. All the work that everybody's done. All the police officers, prosecutors who works a twelve hour shift going out to 61st and Racine or 29th and California or all over the city whenever they are called to help investigations. Everybody does that so they can let a murderer go free \*\*\*."

A prosecutor may comment on, but may not enhance, the credibility of the State witnesses. (*People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564.) Where prosecutorial arguments exceed the boundaries of fairness and impartiality to prejudice the defendant, courts have reversed and remanded the case for new trial. *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222; *People v. Wilson* (1990), 199 Ill. App. 3d 792, 557 N.E.2d 571; *People v. Clark* (1989), 186 Ill. App. 3d 109, 542 N.E.2d 138.

As the court in *Wilson* noted, "[t]o inform a jury that to believe the defense witnesses the jury must find that each of the State's witnesses was lying is a misstatement of law that denies a defendant a fair trial." *Wilson*, 199 Ill. App. 3d at 796-77; *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 13, 526 N.E.2d 525; *People v. Cole* (1980), 80 Ill. App. 3d 1105, 1107, 400 N.E.2d 931.

▮▮ That is exactly what the State has told the jury in this case: that in order to believe defendant, it would have to find that the persons who work within the "system," prosecutors and the police, "are all lying." We find these comments, along with the other errors, denied defendant a fair trial because they invite the jury to believe that State witnesses are more trustworthy because of their status.

We find these comments similar to the reversible error found in *Clark* (186 Ill. App. 3d at 115) (where the prosecutor stated, "It sounded like she was saying that [police officers] would be willing to give up their pensions *** put their family security in jeopardy, lose their jobs, possibly be indicted for perjury because they want to lie on [defendant]"); *People v. Rogers* (1988), 172 Ill. App. 3d 471, 477, 526 N.E.2d 655 (where the prosecutor remarked that police officers "won't get on the stand and lie and make up something"); and *Ford* (113 Ill. App. 3d at 662) (where the prosecutor stated, "Why would *** a sworn [deputy] pull a charade like this and lie and perjure herself *** ?"). If anything, the comments in the present case are more egregious than those made in the above cases.

Further, we find that the State improperly bolstered credibility, invoked jurors' sympathy, and aroused fear and prejudice when it commented that the police officers who testified risk their lives every day for people just like the jurors, and when it further referred to "drug dealers" in this case, although no such issue was raised by the evidence.

In *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 520 N.E.2d 86, the court found the State's comments in closing argument were calculated to arouse the fears and prejudices of the jurors and thus exceeded the bounds of propriety. There, the State's comments included remarks such as, "[The police] are out there trying to protect you and your family. They are putting their lives on the line for you. *** [Y]ou can either *** back them up or you can turn your back on them." *Threadgill*, 166 Ill. App. 3d at 648-50.

While the comments in the present case regarding the status of police officers were not as extensive as those in *Threadgill*, we believe they certainly added to the prejudicial atmosphere created by the whole of the State's comments.

We reject the State's contention that defendant invited the State's comments because he attacked the credibility of the State's witnesses. The invited error doctrine does not go so far "as to insulate any related remarks the prosecutor may choose to make" in response to defense arguments (*People v. Burke* (1985), 136 Ill. App. 3d 593, 604, 483 N.E.2d 674), and we find the cumulative effect of the comments

here went well beyond any adversarial role to substantially prejudice defendant. Because we have noted that the evidence was closely balanced, we also reject the State's argument that any error is harmless.

We further determine that the State did indeed shift the burden of proof when it stated that the jury would have to disbelieve all of the State's witnesses to acquit defendant.

In *People v. Davidson* (1992), 235 Ill. App. 3d 605, 601 N.E.2d 1146, the State made the same comment, where the only issue in the case was whether defendant acted in self-defense. The only issue here was the identity of the shooter; there were no eyewitnesses to testify to the shooting, save defendant and Wells; thus, the jury could find that the State's other witnesses were simply incorrect, but not lying, when they testified that defendant was the shooter. *Davidson*, 235 Ill. App. 3d at 612.

Finally, we address defendant's contention that the State improperly attempted to discredit a defense witness, Carl Varrie, who contradicted Wells' testimony several times, by cross-examining Varrie as to the collateral issue of whether he was fired by the Laporte County, Indiana, sheriff's department, where he formerly worked.

Carl Varrie denied this and stated that he simply quit when he found another job. The State then called the Rev. Emory Varrie, Carl's brother, and inquired whether Carl had been fired; Emory stated that he did not know. The State then called rebuttal witness Larry Kunkel, an officer with the Michigan City police department, who testified that Varrie had not quit and that Varrie's personnel records indicate that he was fired for "excessive absenteeism." Kunkel testified that after the prosecutor asked him to look up Varrie's employment record, Kunkel asked a deputy in the Laporte office for the records, but Kunkel brought no documents with him to court. Kunkel admitted that he did not personally know Carl Varrie, nor did he know how many days Varrie was allegedly absent from his former job.

Defendant argues that the State's attempted impeachment was not proven up and was irrelevant to the issues, and served to prejudice defendant where Varrie's testimony might be considered important to the jury in impeaching the State's key witness, Wells.

Generally, any kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witness; however, the cross-examiner may not impeach a witness on a collateral matter, he must accept the witness' answer. *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267; *People v. Breton* (1992), 237 Ill. App. 3d 355, 364, 603

N.E.2d 1290; *People v. Hall* (1992), 235 Ill. App. 3d 418, 438, 601 N.E.2d 883.

The test for determining if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict; that determination is usually left to the discretion of the trial court and not reversed unless it results in substantial prejudice to defendant. *Collins*, 106 Ill. 2d at 270; *Breton*, 237 Ill. App. 3d at 364; *People v. Kegley* (1992), 227 Ill. App. 3d 48, 54, 590 N.E.2d 922.

Further, it is error for the State, on cross-examination, to ask a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. (*People v. O'Banner* (1991), 215 Ill. App. 3d 778, 794, 575 N.E.2d 1261; *People v. Braggs* (1988), 184 Ill. App. 3d 756, 760, 540 N.E.2d 767.) The danger inherent in such questioning is that the jury will ignore any denial, presume the accuracy of the questions' insinuation or innuendo, and substitute that presumption for proof. *O'Banner*, 215 Ill. App. 3d at 794.

■ We find that the issue of Carl Varrie's employment was collateral to whether defendant was guilty of murdering Donald Patterson. In addition, the State failed to provide sufficient rebuttal evidence that Varrie was fired from his job: there was no copy of his personnel record, no testimony from any person who had seen his personnel record, and in fact, no testimony from any person who had worked with Carl Varrie or even knew him personally. The State never called a witness to testify to such facts after Varrie denied that he was terminated. *People v. Nuccio* (1969), 43 Ill. 2d 375, 393-94, 253 N.E.2d 353.

While we may not have found this error alone to be reversible, we believe it adds to the cumulative and substantial prejudice which defendant suffered.

Because we find defendant was prejudiced by specific and cumulative errors, we decline to address his alternative argument that he received ineffective assistance of counsel.

For all of the foregoing reasons, we reverse and remand this case.

Reversed and remanded.

RIZZI and CERDA, JJ., concur.