# Illinois Official Reports

## Appellate Court

---

### *Bangaly v. Baggiani*, 2017 IL App (1st) 152454

---

| | |
|---|---|
| Appellate Court Caption | SYLLA BANGALY, Administrator of the Estate of Hawa Sissoko, Deceased, Plaintiff, v. ALFRED C. BAGGIANI, Individually and as Agent and Employee of Roadway Express, Inc., a Delaware Corporation; ROADWAY EXPRESS, INC., a Delaware Corporation, n/k/a YRC, a Wholly Owned Subsidiary of YRC Worldwide, Inc., a Delaware Corporation; and YRC WORLDWIDE, INC., a Delaware Corporation, Defendants (Bangaly Sylla, Contemnor-Appellant; The People of the State of Illinois *ex rel.* Ekl, Williams & Provenzale, Appellee). |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-2454 |
| Filed | June 23, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-MC1-600168; the Hon. Daniel J. Lynch, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Daniel T. Coyne, Matthew M. Daniels, Michael R. Johnson, and Kate E. Levine, of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.<br><br>Terry A. Ekl and Vincent C. Mancini, of Ekl, Williams & Provenzale, LLC, of Lisle, for appellee. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Hall and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    The instant appeal concerns a criminal contempt finding arising out of wrongful death litigation in which the contemnor, Bangaly Sylla,[1] was involved as the administrator of the decedent's estate. In connection with that case, Sylla, as administrator of decedent Hawa Sissoko's estate, filed an affidavit of heirship averring that Sissoko had never been married and also submitted answers to interrogatories stating the same. However, shortly before trial, the defendants in that action discovered that Sissoko may have, in fact, been married to a New York cabdriver named Noumouke Keita. After an investigation by the counsel for the estate, a divorce decree was provided that purported to establish that Sissoko was not married at the time of her death. The defendants' request to postpone the trial date to conduct further discovery was denied, and a jury found the defendants liable for Sissoko's death and awarded $4.25 million to Sissoko's estate, which consisted of her parents and siblings as her heirs. The trial court then permitted postjudgment discovery in order to determine Sissoko's proper heirs. After a year of postjudgment proceedings, including a motion to intervene in the case filed by Keita, the trial court found that Sissoko had been married to Keita at the time of her death and vacated the judgment.

¶ 2    The trial court ordered the law firm representing the defendants to initiate indirect criminal contempt proceedings against Sylla based on his statements concerning Sissoko's marital status. The firm was removed after Sylla objected to the firm's appointment, claiming a conflict of interest. Thereafter, the State's Attorney's office was appointed to prosecute the contempt. After the State's Attorney's office investigated the matter, it ultimately declined to prosecute due to the belief that there was an inability to prove the charges. The trial court appointed a third prosecutor, who proceeded with the contempt process and took the case to trial. After a jury trial, the jury found Sylla to be in indirect criminal contempt. After hearing factors in aggravation and mitigation, the trial court sentenced him to six years in the Illinois Department of Corrections (IDOC). On appeal, Sylla raises a number of issues concerning the propriety of the indirect criminal contempt proceedings. We find that the trial court erred in denying Sylla's motion for substitution of judge and, accordingly, reverse and remand for a new trial before a different trial judge.

¶ 3                                    BACKGROUND
¶ 4                              I. Wrongful Death Lawsuit
¶ 5    The facts of the underlying wrongful death litigation that gave rise to the instant criminal contempt were exhaustively discussed by this court in our prior opinion on this matter, *Bangaly v. Baggiani*, 2014 IL App (1st) 123760. We briefly summarize those proceedings to

---

[1]We note that, due to inconsistencies in the record on appeal, Sylla was referred to as "Sylla Bangaly" in our earlier opinion concerning that litigation but is actually named "Bangaly Sylla."

give context to the contempt proceedings at issue in the instant case, taking all facts from our prior opinion.

¶ 6 On May 30, 2007, Sissoko was killed when a commercial tractor trailer truck struck her on I-80/90 near Chesterton, Indiana, while Sissoko was standing in the rightmost eastbound lane of the highway, crushing Sissoko between her vehicle and the tractor trailer. On November 21, 2007, Sylla, Sissoko's paternal uncle, executed an affidavit of heirship, which averred that Sissoko's parents were both still living and that Sissoko had eight siblings. The affidavit of heirship further stated: "HAWA SISSOKO was never married and never had nor adopted any children during her lifetime." On the same day, the probate division of the circuit court of Cook County entered an order declaring that Sissoko's parents and siblings "are the only heirs of the decedent." On December 12, 2007, Sylla was appointed independent administrator of Sissoko's estate.

¶ 7 On March 3, 2009, Sylla, in his capacity as administrator of Sissoko's estate, filed a wrongful death action in the circuit court of Cook County against the driver of the tractor trailer, his employer, and the employer's parent company. The complaint alleged that the driver's negligent operation of the tractor trailer caused Sissoko's death and further alleged "[t]hat HAWA SISSOKO left surviving her parents *** and her brothers and sisters[,] *** all of whom are lawful heirs of the Estate of HAWA SISSOKO." On December 7, 2009, Sylla filed answers to written interrogatories propounded by the defendants. In response to the interrogatory, "If the deceased was married at the date of death, state the date and place of such marriage and the name and address of the spouse of deceased," Sylla answered, "The Plaintiff's decedent was not married as of the date of her death." In response to the interrogatory, "If the deceased has previously been married, state the name(s) and last known address(es) of the former spouse(s), the date(s) of the marriage(s) and the date(s) of separation and/or divorce," Sylla answered, "The Plaintiff's decedent had not been previously married before her death."

¶ 8 On October 31, 2011, approximately two weeks before the November 14, 2011, date scheduled for trial, the defendants filed an emergency motion to dismiss the complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)) or to strike the trial date, claiming that Sissoko had, in fact been married to Noumouke Keita at the time of her death, based on a Malian marriage certificate discovered among Sissoko's personal belongings at the scene of the accident that had originally been mistranslated as a birth certificate. The trial court denied the motion to dismiss but struck the trial date.

¶ 9 On November 9, 2011, Sylla's counsel produced a purported divorce decree for Sissoko and Keita, dated November 17, 2005. The trial court denied the defendants' oral motion to take additional discovery as to the status of Sissoko's marriage. However, on January 13, 2012, the defendants filed an emergency motion to strike the trial date and for an evidentiary hearing, claiming that they had discovered that the divorce decree might be fraudulent and requesting additional time to investigate the issue. The motion to strike the trial date was denied, and a jury trial proceeded on January 17, 2012. On January 24, 2012, the jury returned a verdict in favor of Sissoko's estate and against the defendants, finding that the estate suffered $5 million in damages, which was reduced to $4.25 million due to Sissoko's contributory negligence. The trial court entered judgment on the verdict the same day.

¶ 10    On January 31, 2012, the defendants filed a motion for limited posttrial discovery on the issue of Sissoko's marriage. The trial court entered an order staying the execution of the judgment and granted the defendants' motion for posttrial discovery. During the course of posttrial discovery, the issue shifted from the validity of the divorce decree to the validity of the marriage itself, with Sylla taking the position that the marriage had never been validly entered into and, therefore, the divorce decree was irrelevant.

¶ 11    The parties engaged in extensive posttrial discovery on the issue of the validity of the marriage, including live in-court depositions of several witnesses—including Keita, Sylla, and several experts on Malian law[2]—and numerous affidavits from individuals in Mali. During the course of discovery, Keita sought to intervene in the action.

¶ 12    On December 13, 2012, the trial court found that Sissoko and Keita were validly married at the time of Sissoko's death and that, therefore, he was the sole heir of Sissoko, not her parents or siblings. The trial court also granted Keita's motion to intervene. On January 8, 2013, the defendants filed a motion to vacate the judgment and for dismissal of the case, arguing that the judgment must be vacated, since Sissoko's parents and siblings were not Sissoko's next of kin. Keita also filed a motion, asking for only the damages portion of the judgment to be dismissed and seeking leave to amend the complaint to add him as Sissoko's sole heir. On January 29, 2013, the trial court vacated the judgment as to both liability and damages and dismissed the lawsuit with prejudice.

¶ 13    On appeal, we affirmed the trial court's judgment in most respects but found that Keita should have been permitted to amend the complaint to list him as the sole heir of Sissoko's estate. *Bangaly*, 2014 IL App (1st) 123760, ¶¶ 222-23. After our opinion, Keita and the defendants settled his lawsuit.

¶ 14                        II. Contempt Proceedings

¶ 15    While the appeals in the underlying litigation were pending, the defendants in that case filed a motion for sanctions against Sylla, Sissoko's parents, and the attorney representing the estate, claiming that "[t]he misconduct of the respondents caused the defendants and this Court to incur the expense of a trial based on perjury, forgery, fraud and a false premise which necessitated these [posttrial] proceedings to determine the truth of the heirship of the Estate of Hawa Sissoko." With respect to Sylla, the motion claimed that Sylla falsely filed an affidavit averring that Sissoko had never been married and, in pleadings and through discovery responses, falsely claimed that Sissoko was never married. The motion pointed to deposition testimony that it argued established that Sylla had attended the wedding between Sissoko and Keita and had met Keita several times, and also argued that Sylla was involved in procuring the fraudulent divorce decree. The motion also pointed to the trial court's findings that Sylla, Sissoko's parents, and Keita had perpetrated a fraud on the court.[3]

---

[2]The marriage was a proxy marriage entered into under Malian law, with Keita being represented by his brother during the ceremony.

[3]We note that the trial court's findings of fraud were raised on appeal in connection with the trial court's dismissal of the complaint and denial of leave to amend. We found that "there was no way that the trial court could have properly found that Keita had committed fraud by clear and convincing evidence" (*Bangaly*, 2014 IL App (1st) 123760, ¶ 208) and found that we had no need to consider the

- 4 -

¶ 16        On August 21, 2013, the defendants, Sylla, and the attorney representing the estate came before the trial court for a hearing on the sanctions motion, where the court informed Sylla's counsel:

> "I have some thoughts about how, in fact, the Court should address what it is that Mr. Sylla did or didn't do in the context of these proceedings overall, and so I'm not quite sure that I'm prepared to—to proceed on the sanctions request at this time. I—I have some other thoughts in mind about it. And I know that comes as a bit of a surprise for you, perhaps, but they're not civil in nature. And so we need to address that this morning. ***
>
> And it's an Indirect Criminal Contempt Petition that's going to be drafted today. He'll be served with that today, and we need a Bond Hearing, so I have the Deputies here. He is not to leave the courthouse, not to leave the courtroom. There's a conference room for you to speak to him in.
>
> It's my determination, certainly at this juncture, that, perhaps, that might be what the Court needs to do to render justice regarding your client, so…And we can have some discussions about the scope and the nature of that hearing; but at this point, all we need to do—And Mr. Montgomery [of Williams Montgomery and John (WMJ), the law firm representing the defendants in the wrongful death action,] is here. I'm not going to get the State's Attorney's Office involved. That would be an utter waste of resources. Mr. Montgomery will, or his firm will, act as quote, unquote 'the prosecutor.' "

The trial court then addressed Montgomery and informed him of the allegations that the contempt petition should include. On appeal, Sylla does not argue whether a court can conduct a bond hearing before the filing of a petition for contempt.

¶ 17        The court indicated to Sylla's counsel that "at this point, my inclination is that it's minor contempt; in other words, a maximum penalty would be six months in jail or less, less than six months; or a $500 fine. And it's separate and distinct, at this juncture at least, from the Sanction Petition. So those are the sort of things he should be told about."[4] Sylla's counsel clarified that the court would not be hearing argument on the sanctions motion with respect to Sylla that day, and the trial court further indicated that the sanctions motion would be entered and continued. The court provided counsel a copy of an affidavit of assets and liabilities form, stating that "this gives you some sort of things that are considered for paupers when they present Petitions. Those are similar things that are presented in criminal cases. You may be aware of that, but I'm not sure if you are. And I know this has been sprung on you, Counsel. I—I recognize that. So any other questions you might have, I'll be happy to assist you with them."

¶ 18        Sylla's counsel confirmed that "it has been sprung on me, Judge," and noted that he had been prepared to argue about Sylla's knowledge but "if I'm understanding the Court, what you're saying is it's fait accompli. You've already reached a decision. We're going straight to a Bond Hearing." The court responded that "[a]ctually, this is the beginning of a process" and

findings of fraud as to Sissoko's family, as there was an alternate basis for affirming (*Bangaly*, 2014 IL App (1st) 123760, ¶ 192).

[4]We note that Sylla was present in court during these proceedings; however, there was no interpreter present and the record indicates that Sylla spoke limited English.

that the court would be willing to listen to any arguments during the contempt hearing itself, but that the bond hearing would occur that day. The court noted that "[t]he Court hasn't made its mind up at all. It's—It's just saying that it's appropriate for a Petition to be drafted and for your client to be given an opportunity to defend against it. The nature and scope of the hearing and what the Court needs or doesn't need, moving forward will be the subject of legal discussion between the attorneys and the Court *** "

¶ 19    Later, after arguments on the sanctions motion with respect to the attorney representing the estate had concluded, Sylla's counsel asked to approach the court. Counsel asked:

> "COUNSEL: Judge, you had foreshadowed a little bit that I was being surprised by the conduct and the action that the Court is taking in declining to hear any arguments on the substantive merits of the motion [for sanctions] and instead having Mr. Sylla apparently arrested, as I understand. And I guess I just ask for clarification from the Court. He is not free to leave?
>
> THE COURT: Not free to leave.
>
> COUNSEL: You found probable cause for his arrest?
>
> THE COURT: Yes.
>
> COUNSEL: And the Court wants to hold a Bond Hearing and ultimately an Indirect Civil contempt hearing?
>
> THE COURT: Criminal contempt.
>
> COUNSEL: Criminal contempt."

Counsel then expressed concern that he was a civil, not criminal attorney, and that it would be in Sylla's best interest to have a criminal attorney addressing the matter. Counsel asked for a continuance of the bond hearing so that Sylla could have a criminal attorney present, but the court indicated that while counsel could have such a continuance, Sylla would be held in lockup pending the bond hearing. In response, counsel responded that "if the question [is] presented as to whether I would rather put this over and see him in lockup until I get a criminal defense attorney or conduct a Bond Hearing for which I have little or no experience, I would say the latter; that I would rather conduct a Bond Hearing now rather than subject this citizen, this gentleman, to being locked up."

¶ 20    On August 21, 2013, WMJ filed a petition for indirect criminal contempt against Sylla. The petition stated four grounds: (1) that, on November 21, 2007, Sylla "knowingly and intentionally and without legal justification, signed and filed a false affidavit of heirship *** stating that Hawa Sissoko was never married when he knew this to be false"; (2) that, on March 3, 2009, Sylla "knowingly and intentionally and without legal justification filed a complaint *** which falsely alleged the beneficiaries/heirs of Hawa Sissoko which he knew to be false"; (3) that, on December 7, 2009, Sylla "knowingly and intentionally and without legal justification swore to and filed false answers to interrogatories which falsely stated *** that Hawa Sissoko had not been married before her death"; and (4) that, in early October or November of 2011, Sylla "knowingly and intentionally and without legal justification procured or assisted in procuring a fraudulent divorce decree which was presented to the court."

¶ 21    On September 3, 2013, Sylla, through his civil counsel, filed a motion for substitution of judge as of right "pursuant to 735 ILCS 5/2-1001," a civil statute. On September 4, 2013, criminal counsel was retained and entered an appearance on Sylla's behalf. On September 5,

2013, the new counsel filed a "supplemental motion for substitution of judge" under the criminal statute, noting that the initial motion had requested substitution under the civil counterpart to section 114-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-5 (West 2012)), which was the section of the Code addressing automatic substitution of judge in a criminal matter.

¶ 22 On September 6, 2013, WMJ filed an objection to Sylla's motion for substitution of judge, claiming that the initial motion was filed pursuant to the civil statute, not the criminal statute, and therefore did not satisfy the requirements for substitution of judge as of right under the criminal statute. The objection did not mention the September 5 supplement, but at the hearing on the motion, WMJ argued that the supplemental motion was untimely and could not cure the defects of the initial motion. On September 10, 2013, the trial court denied respondent's motion as untimely.

¶ 23 Sylla then filed a motion for substitution of judge for cause, and on January 8, 2014, his motion was transferred to the presiding judge of the law division, who transferred the motion to a different judge for hearing on the motion. Sylla's motion was denied without prejudice on February 6, 2014, and Sylla then filed a motion to dismiss WMJ as the prosecutor of the indirect criminal contempt. Sylla claimed that WMJ was the law firm representing the defendants in the underlying wrongful death case and, prior to its appointment as prosecutor, WMJ had filed a motion for sanctions against Sylla and the attorney and law firm representing the estate, seeking monetary sanctions in excess of $1 million, which was still pending. Sylla argued that the trial court had not first appointed the State's Attorney's office, as required, and instead appointed an interested party as the prosecutor. Accordingly, Sylla requested that WMJ be removed as the prosecutor of the criminal contempt.

¶ 24 On April 21, 2014, Sylla's motion to remove WMJ as the prosecutor was granted and the State's Attorney's office was appointed to prosecute the matter. On April 22, 2014, Sylla filed another motion for substitution of judge as of right, arguing that "[a]s we know now (because the Court removed the firm), the appointment of the law firm of WM&J as special prosecutor in this matter lends little or no legitimacy to any of [the] responses filed by its attorneys." On May 20, 2014, Sylla's motion for substitution of judge was denied, with the court noting that WMJ's presence as the prosecutor at the time was irrelevant to the court's denial of the initial motion for substitution due to its untimeliness. At that hearing, the court made clear that, "[i]t could be that the Court, if he were to be found guilty of contempt, could consider the allegations and any determination by a trier of fact [to be] a major contempt."

¶ 25 On October 30, 2014, after a pretrial status hearing, the trial court entered an order, noting that "the Cook County State's Attorney's Office indicated in open court that it was declining to further prosecute these contempt allegations; that this Court denied the Office's request; [and] that this Court requested the Office[ ] to provide its reasons for its decision (over respondent's objection)." The transcript from that hearing indicates that the assistant State's Attorney (ASA) informed the trial court that, after "a thorough review" by the State's Attorney's office, "the State's Attorney's Office has decided to decline prosecution in this matter." The ASA explained that the State's Attorney's office "takes its burden very seriously, and at this point in time, the State does not believe that it should proceed further." After questioning by the trial court, the ASA indicated that there had been an internal report prepared concerning the charge that "relates to all the investigations we've done and what would be involved in painting the proofs and the likelihood of success," but that he believed it would be protected work product

that would not be available for review by the trial court. The trial court instructed the ASA to check on whether that document could be turned over to the trial court, as a criminal contempt proceeding was *sui generis* and "you're, in essence, an agent of the Court. And perhaps these might be the circumstances where the Court needs to understand why it is you're declining to prosecute. That's the way I look at it."

¶ 26 The parties came before the trial court again on November 14, 2014, concerning the trial court's ability to review any of the State's Attorney's office's materials, where a supervising ASA informed the trial court that "we take a very hard and fast line and we simply do not share that with anyone." The trial court then engaged in a discussion with the ASA concerning the circumstances under which State's Attorney's office could disclose its reasoning to the trial court, noting that "I'm a bystander, and I just need to know what you're looking at and what you're overlooking. The Court made a decision long ago that there was a reasonable probability of conviction which is what brought forth these sort of allegations against this defendant, and he's been defending against them now for a year, and the prosecutor's office is stepping up and telling me in a conclusory way that they're going to decline, they don't believe they can meet the burden of proof." At this point, Sylla's counsel interjected and stated that, "based on kind of the direction that this is going, I just want to get on the record that I think we've kind of crossed the line here on violation of separation of powers, and I want that to be clear that that's the defendant's position at this point after [the ASA] has made clear—" The trial court then stated:

"That's exactly what my concern is here, counsel, separation of powers. It's the prosecutor's office exercising the Court's power.

I know that's my perspective on it, and I respect and appreciate your perspective on it, where the judiciary would be in essence becoming the executive so to speak. I understand that. I'm appreciative of it, and I think my remarks bear that out today.

I'm a bystander here, and this unfolded in the presence of the Court, and in essence the victim here is the Court so to speak, a three-year proceeding in a case that's involving fraud and fraud to the tune of a $20 million request of a jury and a $4.25 million award with all the underlying facts and circumstances surrounding contributory and comparative negligence itself. So the record bears all that out.

I understand your concern here, counsel. That's why I'm trying to be cautious and careful how this is exercised, but I can't be informed by a conclusion after I've witnessed what it is that's transpired here.

I want to be informed by a good decision and things that perhaps the Court has overlooked, but conclusions won't do that for me, and they certainly wouldn't do that for anyone who may be called upon to look at this after the Cook County State['s] Attorney's Office declines."

¶ 27 On November 20, 2014, Sylla filed a motion requesting the trial judge to recuse himself from the contempt proceedings. Sylla argued that the trial judge's comments that he was a bystander, or witness, to the contempt charges and had "made a decision long ago that there was a reasonable probability of conviction" crossed a line and violated the separation of powers. Sylla further argued that a criminal contempt proceeding required deliberateness and caution, which was "a problem" when the trial judge "is a witness to a matter that he intends to preside over and has demonstrated, both implicitly and explicitly, that he is invested in a predetermined outcome of Sylla's guilt."

- 8 -

¶ 28 On January 6, 2015, Sylla filed a supplement to his motion requesting the trial judge to recuse himself, noting that the trial judge would be appointing a third prosecutor, Terry A. Ekl, to prosecute the matter instead of dismissing the contempt petition after the State's Attorney's office declined to prosecute. The motion claimed that the trial judge "has consistently and persistently demonstrated an inability to be impartial to Bangaly Sylla and has shown a prejudgment of the evidence (and likely its admissibility)."

¶ 29 On January 9, 2015, the trial court denied Sylla's motion for recusal and, on February 5, 2015, appointed Ekl as prosecutor of the contempt petition. On February 13, 2015, Sylla filed a motion to strike the appointment of Ekl as prosecutor, arguing that under the statute concerning appointment of a special prosecutor, a special prosecutor could only be appointed where the State's Attorney's office was sick or absent, unable to attend, or was interested in the cause or proceeding. In the instant case, none of those situations applied, and the State's Attorney's office was not participating in the proceeding due to the exercise of its prosecutorial discretion. Sylla further argued that the trial court's appointment of a subsequent special prosecutor violated the separation of powers and also violated due process. On March 20, 2015, the motion to strike the appointment of Ekl was denied.

¶ 30 On April 27, 2015, the trial court entered an order dismissing count IV of the contempt petition, which had provided that, in early October or November of 2011, Sylla "knowingly and intentionally and without legal justification procured or assisted in procuring a fraudulent divorce decree which was presented to the court."

¶ 31 III. Indirect Criminal Contempt Trial

¶ 32 On May 11, 2015, the first day of trial, the prosecution sought leave to amend the allegations of the petition for indirect criminal contempt to include allegations that Sylla's conduct obstructed, interfered, or hindered a court in the administration of justice in a court proceeding; the trial court granted the prosecution leave to do so; and the prosecution filed the amended petition on May 12, 2015. The amended petition alleged three counts. Count I alleged that "[o]n or about November 21, 2007, Respondent knowingly and intentionally and without legal justification signed and filed a false Affidavit of Heirship *** stating that Hawa Sissoko was never married when he knew this to be false. That by making said statement Respondent obstructed, interfered and/or hindered a party or the court in the administration of justice in court proceedings." Count II alleged that "[o]n or about March 3, 2009, Respondent knowingly and intentionally and without legal justification filed a complaint *** and falsely alleged beneficiaries/heirs of Hawa Sissoko which he knew to be false. That by making that statement Respondent obstructed, interfered and/or hindered a party or the court in the administration of justice in court proceedings." Count III alleged that "[o]n or about December 7, 2009, Respondent knowingly and intentionally and without legal justification swore to and filed false answers to interrogatories which falsely stated *** that Hawa Sissoko had not been married before her death. That by making said statement Respondent obstructed, interfered and/or hindered a party or the court in the administration of justice in court proceedings."

¶ 33 A. Hanson Williams

¶ 34 The first witness on behalf of the prosecution was Hanson Williams, one of the attorneys representing the defendants in the wrongful death action, who explained to the jury the process of filing a wrongful death action and the effect that the identity of the decedent's heirs could

have on the damages portion of the lawsuit. Williams also identified the affidavit of heirship filed by Sylla in connection with the order appointing him as administrator of Sissoko's estate, the complaint in the wrongful death action filed by Sylla in his capacity as administrator of the estate, and the answers to interrogatories filed by Sylla in the wrongful death action.

¶ 35    Williams also testified as to the history of the wrongful death litigation—including the posttrial discovery, vacation of the judgment, and appeal—and about the number of hours spent by WMJ in unraveling the issues concerning the rightful heirs to Sissoko's estate. Williams also published several excerpts from the evidence deposition Sylla gave in the underlying case. In the deposition, Sylla testified that he read the answers to the interrogatories that he signed at the time that he signed them. Sylla further testified that he met with the attorney in an earlier Indiana wrongful death case filed by the estate and informed him that Sissoko was not married because "[i]f she had been married, somebody would have told me." Sylla testified that he did not ask Sissoko's parents whether she was married, nor did he conduct any investigation to discover whether she was married.

¶ 36    On cross-examination, Williams testified that the complaint in the wrongful death action was unverified and was signed by the attorney representing the estate, not by Sylla himself. Williams further testified that answers to interrogatories were typically drafted by the attorneys. Williams also testified that Sylla was not Sissoko's heir and would not have been entitled to any portion of a wrongful death verdict.

¶ 37                                B. Noumouke Keita

¶ 38    Noumouke Keita, Sissoko's husband, testified through an interpreter that he married Sissoko in July 1998 and that she came to the United States to live with him in New York in 2000. Keita testified that after Sissoko moved to Chicago to live with Sylla and his wife and to work braiding hair, Keita visited her twice. On these visits, Keita testified that he had met both Sylla and his wife. On one 2006 visit, Sissoko informed Sylla that Keita was her husband. Keita also testified that Sylla contacted him to inform him of Sissoko's death.

¶ 39    The parties stipulated that Keita had given an answer during an evidence deposition in which he testified that he met Sylla at the house of an individual named Ibrahim Thera, but on cross-examination, Keita testified that he met Sylla "at his place, not Thera's place."

¶ 40                            C. Motion for Directed Verdict

¶ 41    The prosecution then rested, and Sylla's counsel made a motion for a directed verdict. The trial court granted the motion for directed verdict as to the count concerning the allegations in the complaint because the complaint was signed by the attorney for the estate and not by Sylla. Accordingly, the only counts remaining in the petition concerned the affidavit of heirship and the answers to interrogatories.

¶ 42                                D. Aminata Konde

¶ 43    Aminata Konde, Sylla's wife, testified through an interpreter that Sissoko came to live with her and Sylla in 2005 and worked with Konde braiding hair. Konde testified that, after Sissoko's death, there was a seven-day funeral held at Konde and Sylla's home, and Keita did not attend. Konde testified that she had never met Keita and had "never heard of him," nor had he ever come to her hair-braiding shop. Sissoko never informed Konde that she was married,

nor had Konde ever observed anyone introducing himself to Sylla as Sissoko's husband. Konde testified that during the time that Sissoko lived with her and Sylla, she asked Konde to help her find a husband because she wanted to marry and have a child.

¶ 44    On cross-examination, Konde testified that Sylla was close with his brother, Sissoko's father, and spoke often with him. She further testified that Sissoko informed her that she was not married.

¶ 45                    E. Jury Verdict and Sentencing

¶ 46    On May 12, 2015, the jury found Sylla guilty of contempt of court for filing the affidavit of heirship and for filing the answers to interrogatories. On May 13, 2015, the trial court entered judgment on the jury's verdict.

¶ 47    On June 4, 2015, the trial court entered an order extending Sylla's time to file a posttrial motion and, on June 26, 2015, Sylla filed a posttrial motion, which was denied by the trial court on July 14, 2015. Sylla was sentenced to six years in the Illinois Department of Corrections, followed by three years of mandatory supervised release.

¶ 48    At the sentencing hearing, Sylla's counsel argued for probation, while the prosecution argued that "a period of incarceration is mandated" due to the serious nature of Sylla's conduct and asked the court "to impose whatever the Court feels to be an appropriate terms of years in the Illinois Department of Corrections." The court found that probation was not appropriate and "would seriously deprecate the nature of this offense given the fact that it was the Court that ultimately through all of the participants in these proceedings that was assailed by this conduct, by this failure to bring the proper parties, by this failure all along to cease these proceedings and dismiss the case." In determining an appropriate sentence, the court noted that "ultimately this is grounded in perjury and obstruction of justice" (Class 3 and Class 4 felonies, respectively), but that there were also other statutes which it found instructive in fashioning a sentence. The court pointed to residential burglary (a Class 1 nonprobational felony), which was distinguished from burglary in that "when you burglarize and commit the same sort of acts within a residence, you violated the sanctity of a home and that's tantamount to what's occurred here in violating the sanctity of a court and a court proceeding and, in essence, violating or abusing, I should say, the right of free access that persons are given to come into courthouses." The court also identified as instructive: (1) theft of property between $500,000 and $1 million (a Class 1 nonprobational felony); (2) theft of property exceeding $1 million (a Class X nonprobational felony); and (3) identity theft where property exceeding $100,000 in value is taken (a Class X nonprobational felony).

¶ 49    On August 13, 2015, Sylla filed a motion to reconsider sentence, which was denied on September 3, 2015. Sylla filed a notice of appeal the same day and this appeal follows.

¶ 50                            ANALYSIS

¶ 51    On appeal, Sylla raises a number of issues, arguing (1) the evidence presented was insufficient, (2) the trial court erred in admitting certain evidence, (3) the trial court appointed prosecutors with a personal and/or financial interest, (4) the trial court erred in denying Sylla's motion for substitution of judge as of right, (5) the trial judge was biased, (6) the trial court violated the separation of powers, (7) the special prosecutor amended the charging instrument without Sylla's knowledge, (8) the special prosecutor engaged in misconduct, (9) the jury

- 11 -

instructions were defective, (10) Sylla received ineffective assistance of counsel, (11) the trial court considered impermissible factors in sentencing Sylla, and (12) Sylla's sentence was excessive. We find Sylla's arguments concerning the denial of his motion for substitution of judge as of right to be dispositive of the instant appeal, and accordingly limit our discussion to an analysis of that issue.

¶ 52    A defendant in an indirect criminal contempt proceeding may move for a substitution of judge under section 114-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-5 (West 2012)). *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 21; see *People ex rel. Kunce v. Hogan*, 67 Ill. 2d 55, 63 (1977) (discussing section 114-5 in connection with a contempt finding). Section 114-5(a) provides:

> "Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." 725 ILCS 5/114-5(a) (West 2012).

¶ 53    Thus, "[p]ursuant to the statute, a defendant must be granted an automatic substitution of judge if the defendant meets the following requirements: (1) the motion is made within 10 days after defendant's case is placed on the judge's trial call; (2) the motion names only one judge unless the defendant is charged with a Class X felony, in which case he may name two judges; (3) the motion must be in writing; and (4) the motion must allege the trial judge is so prejudiced against the defendant that the defendant cannot receive a fair trial. In addition [the supreme] court has held that the motion must be made before the trial judge makes a substantive ruling in the case." *People v. McDuffee*, 187 Ill. 2d 481, 487-88 (1999). "If the motion is made within 10 days after the cause has been placed on the judge's call, the named judge cannot proceed further and must transfer the case." *SKS & Associates*, 2012 IL App (1st) 103504, ¶ 21. "The motion for substitution of judge may be made at any other time, but in those instances the movant has the burden of showing prejudice on the part of the judge." *SKS & Associates*, 2012 IL App (1st) 103504, ¶ 21. "Because the right to a fair and impartial trial judge is fundamental, section 114-5(a) is to be construed liberally to promote rather than to defeat substitution" (*People v. Ryan*, 264 Ill. App. 3d 1, 3 (1994) (citing *People v. Walker*, 119 Ill. 2d 465, 480-81 (1988))), and " 'reversible error occurs where the statute is not so construed' " (*McDuffee*, 187 Ill. 2d at 488 (quoting *Walker*, 119 Ill. 2d at 481)). "A liberal construction of the statute, however, does not mean that a motion will be considered to have been timely filed in all cases." *People v. Evans*, 209 Ill. 2d 194, 215 (2004). Whether a motion for substitution of judge complies with section 114-5's requirements is a question of law that we review *de novo*. *People v. Tate*, 2016 IL App (1st) 140598, ¶ 13. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 54    In the case at bar, the petition for indirect criminal contempt was filed against Sylla on August 21, 2013, after the trial court instructed WMJ to draft the petition during a hearing on pending sanctions motions the same day. Our supreme court has instructed that a motion for

substitution is timely filed "if it is brought within 10 days of the date the defendant could be 'charged with knowledge' that the judge at issue had been assigned to his case." *McDuffee*, 187 Ill. 2d at 490. Here, Sylla could be charged with knowledge that the trial judge at issue had been assigned to his case as of the date the petition was filed on August 21. While Sylla argues on appeal that he could not be charged with such knowledge until September 10, 2013, because there was no interpreter present at the August 21 court hearing during which the court instructed that the contempt petition be filed and because "[t]he trial court was unclear about whether the matter was indirect or constructive direct criminal contempt," we do not find these arguments persuasive. Sylla was represented by counsel at the hearing, and counsel's knowledge of the trial judge's involvement in the case can be imputed to Sylla. *People v. Wadley*, 169 Ill. App. 3d 1036, 1042 (1988); see also *Tate*, 2016 IL App (1st) 140598, ¶ 16 (finding that the record indicated that the assistant public defender could not be charged with knowledge of the judge's assignment to the courtroom, so such knowledge could not be imputed to the defendant). Furthermore, while the trial court made reference to constructive direct criminal contempt, it noted a number of times that the petition to be drafted was an indirect criminal contempt petition, and the petition actually drafted and filed on August 21 was clearly labeled as an indirect criminal contempt petition. Accordingly, the 10-day time period began to run on August 21, 2013.

¶ 55    On September 3, 2013, Sylla, through civil counsel, filed a motion for substitution of judge as of right "pursuant to 735 ILCS 5/2-1001."[5] The motion did not include an allegation of prejudice. Two days later, on September 5, 2013, Sylla, through new counsel, a criminal lawyer, filed a "supplemental motion for substitution of judge," which cited section 114-5(a) of the Code and included an allegation of prejudice. On September 6, 2013, WMJ, the special prosecutor at the time, filed an objection to Sylla's September 3 motion, claiming that it did not satisfy the requirements of section 114-5(a). The objection did not discuss Sylla's September 5 "supplemental motion," but at the hearing on Sylla's motion for substitution, WMJ argued that the supplemental motion could not cure the defects of the original motion and was filed beyond the 10-day time limit such that it could not be considered a timely-filed motion itself. On September 10, 2013, the trial court denied respondent's motion as untimely. We thus must consider whether Sylla's September 5 "supplemental motion" cured any defect in his timely-filed September 3 motion such that the motion for substitution of judge should have been granted.

¶ 56    The situation present in the instant case—where the original motion is timely filed but the amendment or correction is filed after the 10-day period has elapsed—has rarely been considered by our courts. The only case that we have discovered that deals directly with this factual scenario is the Fourth District case of *People v. Burns*, 188 Ill. App. 3d 716 (1989). In *Burns*, the defendant filed a timely motion for substitution of judge pursuant to section 114-5(a), but did not include an allegation of prejudice. *Burns*, 188 Ill. App. 3d at 719-20. Nine days later, the defendant filed an amended motion for substitution of judge, which added a paragraph alleging prejudice. *Burns*, 188 Ill. App. 3d at 720. The trial judge denied the amended motion, finding that the allegations of prejudice must be made within the statutory

___

[5]The tenth day after August 21, 2013, was August 31, a Saturday. The Monday following August 31, September 2, 2013, was Labor Day, a court holiday. Accordingly, the September 3, 2013, motion was timely filed. See 5 ILCS 70/1.11 (West 2012).

- 13 -

10-day period. *Burns*, 188 Ill. App. 3d at 720. On appeal, the Fourth District affirmed, finding "[t]hough it is well established substitution of judge provisions are to be liberally construed, the statute cannot be construed so as to contravene its express provisions. [Citation.] To be entitled to relief, the defendant must comply with the express requirements of the statute. [Citation.] Defendant's failure to comply with the statute bars the automatic substitution." *Burns*, 188 Ill. App. 3d at 721.

¶ 57    In the case at bar, the trial court below and both WMJ, the initial special prosecutor, and Ekl, the current special prosecutor, relied on the holding in *Burns* to find that Sylla's supplement to his motion for substitution could not cure its defects. However, we cannot find that the *Burns* court's strict interpretation of the statute comports with the liberal construction we are instructed to apply to motions for substitution of judge. See *Walker*, 119 Ill. 2d at 480-81. We note that the *Burns* court cited to *People v. Howell*, 16 Ill. App. 3d 989 (1974), *aff'd*, 60 Ill. 2d 117 (1975), a case in which the Fifth District affirmed the trial court's denial of a defendant's motion for substitution of judge. In that case, the appellate court noted that "[d]efendant's motion was not in writing and not made within ten days after the case had been placed on the trial call of [the trial judge], but these technical defects may be overlooked under the liberal construction of the statute called for by *People v. Kostos*, [21 Ill. 2d 451, 454 (1961)]." *Howell*, 16 Ill. App. 3d at 993. However, the motion was nevertheless properly denied because the motion had not been made until after the judge had ruled on substantive issues in the case. *Howell*, 16 Ill. App. 3d at 993. The *Burns* case found that the *Howell* court's statement about the effect of the motion's technical deficiencies "was *dicta* and we decline to adopt that view." *Burns*, 188 Ill. App. 3d at 721.

¶ 58    The holding of the *Burns* court has been cited by a handful of courts on this issue, but only once[6] in a case involving a defendant attempting to correct a defect in the motion, as was present in both *Burns* and in the case at bar. In *People v. Langford*, 246 Ill. App. 3d 460 (1993), a case cited by Sylla, the Fifth District was presented with a case in which the defendant filed a timely motion for substitution of judge pursuant to section 114-5(a), but named two judges in the motion instead of one. *Langford*, 246 Ill. App. 3d at 461. At the hearing on the motion, the motion was treated as a motion for substitution of judge for cause under section 114-5(d) because it named more than one judge, despite the defendant's statements that he intended it to be a motion for automatic substitution under section 114-5(a), and the motion was denied for failure to attach an affidavit as required under section 115-4(d). *Langford*, 246 Ill. App. 3d at 462-63. Over the next several court dates, the defendant continued to argue that his motion should have been treated as a motion for automatic substitution of judge under section 114-5(a), and the judge ultimately agreed to consider the motion as one for automatic substitution, but then denied the motion because it named two judges rather than one. *Langford*, 246 Ill. App. 3d at 464. The defendant argued that "the defect of naming the second judge should be considered a technical defect," but the judge found that it was not merely a

_____

[6]We note that the Third District considered a case in which the State failed to allege prejudice in its motion for substitution and later amended the motion to include such an allegation. *People v. Jackson*, 2015 IL App (3d) 140300, ¶ 35. However, in that case, the State "concede[d] that [the amended motion] was untimely, as it was filed more than 10 days after the cause had been placed on [the judge's] trial call." *Jackson*, 2015 IL App (3d) 140300, ¶ 36. Thus, the court did not discuss the issue further. We also note that *Jackson* contained a special concurrence criticizing the *Burns* court's analysis as "fatally flawed." *Jackson*, 2015 IL App (3d) 140300, ¶ 64 (Holdridge, J., specially concurring).

- 14 -

technical defect and warranted the denial of the motion for substitution. *Langford*, 246 Ill. App. 3d at 464.

¶ 59   On appeal, the Fifth District found that "[o]ur review of the applicable case law brings us to the conclusion that an ambiguous motion for substitution should not be summarily denied without allowing defendant to clarify his mistake, if he requests such an opportunity." *Langford*, 246 Ill. App. 3d at 465. The court noted that the motion filed by the defendant contained surplusage that rendered the motion ambiguous because it did not state which subsection of section 114-5 was applicable, named a second judge that had not yet been assigned to the case, did not allege facts necessary to support a finding of actual prejudice, and did not include an affidavit as required under section 114-5(d). *Langford*, 246 Ill. App. 3d at 466. The court did not agree with the way the motion had been treated by either of the trial judges below, noting that "we do not agree with either analysis but believe that the real issue is whether a defendant can be prohibited from amending a defective and ambiguous motion. Under the rule of liberal construction, and under the facts of this case, we do not believe that the trial court was authorized to deny the motion after defendant had made it clear that the motion was intended to be filed under section 114-5(a) and that the motion was not intended to be for cause." *Langford*, 246 Ill. App. 3d at 466.

¶ 60   The *Langford* court noted that "defects in a motion for substitution are often held to be 'technical defects' not warranting denial of the motion under the liberal construction rule set forth by the Illinois Supreme Court in cases up through *People v. Walker*." *Langford*, 246 Ill. App. 3d at 466. The court recognized that there were cases upholding the denial of motions for substitution on the basis that the statute had not been substantially complied with, but noted that "none of the cases cited by the State, and no case we have found, deals precisely with the factual situation presented by this case, that the motion mistakenly named two judges but defendant acknowledged and sought to amend the mistake at his first opportunity." *Langford*, 246 Ill. App. 3d at 467. Accordingly, the court found that "[w]here the facts of the cases show that the defendant has made a mistake in filing the motion and then requested to correct the mistake, *** the rule favors amendments. Denying a motion for automatic substitution of judge for failure to comply with a strict construction of the statute without a chance to correct the mistake defeats rather than promotes substitution of judges, an outcome which is contrary to the purpose of the law." *Langford*, 246 Ill. App. 3d at 467.

¶ 61   The *Langford* court acknowledged the *Burns* decision, but found the case distinguishable on its facts. *Langford*, 246 Ill. App. 3d at 467. The court additionally noted that "[t]o the extent, however, that the ruling of *Burns* conflicts with the ruling in this case, we decline to follow it." *Langford*, 246 Ill. App. 3d at 467.

¶ 62   In the case at bar, we find the *Langford* court's analysis more instructive to the situation present here than the *Burns* court's analysis and find that the *Langford* court's reasoning comports with the liberal construction of the statute that our supreme court instructs us to apply. As noted, in the case at bar, on September 3, 2013, Sylla, through his civil counsel, filed a motion for substitution of judge as of right. At the time of filing of the motion, Sylla was represented by civil counsel, who had been unaware of the fact that the trial court was starting the process to have Sylla prosecuted for indirect criminal contempt and apparently did not have criminal experience. The motion claimed that it was filed "pursuant to 735 ILCS 5/2-1001," which is the civil substitution of judge statute, and did not include an allegation of prejudice. However, the motion did expressly state that "[t]he tenth day following the filing of the

- 15 -

[petition for indirect criminal contempt] was Saturday, August 31, 2013," thereby referencing the 10-day time limit for substitution of judge in criminal proceedings, which is not a requirement included in the civil statute. Thus, from the language of the motion itself, it was unclear whether Sylla was attempting to file a motion for substitution of judge under the civil or criminal statute, rendering the motion ambiguous. See Black's Law Dictionary 88 (8th ed. 2004) (defining "ambiguity" as an "uncertainty of meaning or intention, as in a contractual term or statutory provision"). Two days later, on September 5, 2013, Sylla, through new counsel, a criminal lawyer, filed a "supplemental motion for substitution of judge," which cited section 114-5(a) of the Code and included an allegation of prejudice, clarifying any ambiguity over Sylla's intention. This supplement was filed before the hearing on the motion for substitution and before the trial judge made any substantive rulings. Thus, in the case at bar, Sylla timely filed an ambiguous motion for substitution, immediately sought to supplement that motion to clarify the ambiguity, and did so before the original motion had been ruled on or any further proceedings in the case had occurred. We cannot find that a denial of the motion for substitution based solely on the fact that the supplement was filed two days after the deadline is construing the statutory requirements in such a way so as " 'to promote rather than defeat' substitution" (*Walker*, 119 Ill. 2d at 480-81).

¶ 63    In reaching this result, we note that compliance with the statutory requirements is certainly required, and there is no dispute that Sylla's original motion did not comply with the requirement that it contain an allegation of prejudice. However, where such an error is *immediately* sought to be corrected, as occurred in the case at bar, we cannot find that the initial omission of the allegation renders the motion fatally defective, despite the fact that the correction happens to occur after the 10-day deadline has passed. There is nothing in the language of section 114-5(a) that prohibits amendments to motions for substitution after the 10-day time period has passed and, as noted, the *Burns* court's suggestion that section 114-5(a) contains such a prohibition conflicts with the liberal interpretation we are required to give section 114-5(a). See *Walker*, 119 Ill. 2d at 480-81. We note that the time period between the filing of a motion under section 114-5(a) and the trial court's order transferring the case is necessarily brief, given that "[u]pon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion." 725 ILCS 5/114-5(a) (West 2012). So long as the motion was originally timely filed and the contents of that motion—amended or otherwise—are sufficient by the time the trial court is asked to rule on it, we see no reason why such a motion should be denied.

¶ 64    This is especially true given the unique facts of this case, where the trial court admittedly surprised Sylla with criminal contempt proceedings when he arrived for a hearing on a motion for sanctions, ordering the contempt petition to be filed and a bond hearing to be held the same day. Sylla at the time was represented by civil counsel on the sanctions matter, who was unexpectedly presented with the trial court's *sua sponte* shifting the fundamental nature of the proceedings before it from a civil to a criminal matter. Civil counsel nevertheless agreed to represent Sylla at the bond hearing because the alternative was Sylla remaining in jail until he retained criminal counsel. Sylla's civil counsel filed the original, timely-filed motion for substitution, and the next day, criminal counsel filed his appearance. The day after that, criminal counsel supplemented the motion for substitution to include the required elements under the statute. In light of the circumstances of this case, the motion for substitution should have been granted and the trial court erred in denying it. "[W]hen a motion for substitution of

judge is improperly denied, all subsequent action by the trial judge, beyond transfer of the matter, is void." *Tate*, 2016 IL App (1st) 140598, ¶ 20. Accordingly, this case must be remanded to the trial court for a new trial before a different judge.

¶ 65    We note that, "[w]hen an appellate court reverses a criminal conviction and remands the case for a new trial without deciding [the] defendant's contention that the evidence at the first trial was insufficient, *** the court risks subjecting the defendant to double jeopardy." *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). Double jeopardy concerns apply to criminal contempt proceedings. See, *e.g.*, *Winning Moves, Inc. v. Hi! Baby, Inc.*, 238 Ill. App. 3d 834, 841 (1992) (reviewing sufficiency of the evidence after reversal of an indirect criminal contempt proceeding); *In re Marriage of Alltop*, 203 Ill. App. 3d 606, 616-17 (1990) (same); *Falcon, Ltd. v. Corr's Natural Beverages, Inc.*, 173 Ill. App. 3d 291, 298 (1988) (same). However, it is not clear whether they apply to improper denials of motions for substitution of judge, as we have discovered limited case law discussing double jeopardy concerns in that situation. See *People v. Pace*, 225 Ill. App. 3d 415, 433 (1992) (after determining that the defendant's motion for substitution of judge was improperly denied, considering the sufficiency of the evidence in order to determine whether there was a risk of double jeopardy on retrial). But see *People v. Bosley*, 233 Ill. App. 3d 132, 138 (1992) (in considering a case in which the trial court exceeded the appellate court's mandate, finding that "[a]s the circuit court's order was void, the order could not violate the constitutional guarantee against double jeopardy"). Out of an abundance of caution, and because sufficiency of the evidence was an issue raised by Sylla on appeal, we consider the sufficiency of the evidence presented at trial in order to determine whether any double jeopardy concerns would arise on remand.

¶ 66    "The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " *People v. Bellmyer*, 199 Ill. 2d 529, 536-37 (2002) (quoting U.S. Const., amends. V, XIV). "The same protection is afforded by the Illinois Constitution [citation] and by statute [citation]." *Bellmyer*, 199 Ill. 2d at 537. "The cornerstone of the double jeopardy clause is 'that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " *People v. Williams*, 188 Ill. 2d 293, 307 (1999) (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)).

¶ 67    "The double jeopardy clause prohibits retrial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding." *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (citing *Burks v. United States*, 437 U.S. 1, 11 (1978)). "It does not, however, preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction." *Lopez*, 229 Ill. 2d at 367 (citing *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990)). In the case at bar, Sylla's conviction must be set aside because of an error in the proceedings leading to the conviction, namely, the improper denial of his motion to substitute judge. "Accordingly, we consider whether the evidence presented at trial *** was sufficient to convict. [Citation.] The relevant question is whether, after viewing the evidence in the light most favorable to the [prosecution], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" *Lopez*, 229 Ill. 2d at 367. The determination that evidence is sufficient to support a

conviction for purposes of a double jeopardy analysis does not in any way imply that the reviewing court has made a finding as to the defendant's guilt that will be binding in any subsequent proceedings. *Taylor*, 76 Ill. 2d at 310 ("Our holding in no way implies, of course, *** that we have made a finding as to defendant's guilt that would be binding on the court on retrial."); *Pace*, 225 Ill. App. 3d at 433 ("We note that the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy.").

¶ 68    In the case at bar, the evidence presented at trial was sufficient for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt. Keita testified that he had met Sylla twice and that Sissoko had informed Sylla that Keita was her husband, testimony which a trier of fact could choose to believe, despite the fact that Konde, Sylla's wife, testified that Keita had never visited her home or shop. Furthermore, Sylla testified in his evidence deposition that he reviewed the answers to interrogatories at the time that he signed them and further testified that he did not conduct any investigation before stating that Sissoko was never married, relying on the theory that someone would have informed him had she ever married. Accordingly, there was sufficient evidence for a rational trier of fact to have found the essential elements of the contempt charges beyond a reasonable doubt and, consequently, we reverse and remand for a new trial and proceedings consistent with this opinion. Since we are remanding for a new trial, we have no need to consider Sylla's other allegations of error.

¶ 69                                    CONCLUSION

¶ 70    For the reasons set forth above, we find that the trial court erred in denying Sylla's motion for substitution of judge pursuant to section 114-5(a) of the Code and, accordingly, reverse and remand the cause for a new trial before a different trial judge. The cause is reversed and remanded with instructions that the jury verdict finding Sylla guilty of indirect criminal contempt and the trial court's entry of judgment on the verdict be vacated and that this case be transferred to the presiding judge of the criminal division of the circuit court of Cook County to be heard by a different judge.

¶ 71    Reversed and remanded with directions.